EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff,

v.

WESTINGHOUSE ELECTRIC
CORPORATION, Defendant.

No. Civ. 80–853.

United States District Court,
D. New Jersey.

July 29, 1982.

Michael J. Connelly, General Counsel, Washington, D.C. by John J. Lokos, Trial Atty., Philadelphia, Pa., for plaintiff.

Carpenter, Bennett & Morrissey by Thomas P. Morrissey and Rosemary A. Hall, Newark, N.J., for defendant.

OPINION

BIUNNO, Senior District Judge.

This is a suit for alleged violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. § 621 et seq.

After pretrial, discovery, an amended complaint and answer thereto, and the submission of trial briefs and proposed findings of fact and conclusions of law, EEOC filed a motion for partial summary judgment (i.e., on the issue of violation) and Westinghouse responded with a cross-motion for summary judgment on a number of defenses.

At the initial hearing, the court expressed some reservations about taking up the issues on the basis of excerpts from separate but interrelated documents, one being a "Pension and Insurance Agreement" of 1976, and the other being the Westinghouse Pension Plan of 1976. It indicated that it would prefer to study both documents in full, along with the corresponding previous versions of 1966.

It turned out that both documents were interrelated with the underlying collective bargaining agreement between Westinghouse and the I.U.E. the exclusive bargaining representative. The court ended up with two sets of documents, presented as Joint Exhibits.

Exh. J–1 is the collective bargaining agreement of 1966, and the Pension and Insurance Agreement negotiated and agreed to at the same time.

Exh. J–2 is the Westinghouse Pension Plan in full text as of 1966.

Exh. J–3 corresponds to J–1 but is the pair of agreements negotiated and agreed to in 1976, and was in force when the alleged violation occurred.

Exh. J–4 corresponds to J–2, but is the full text of the Westinghouse Pension Plan as it stood as the result of the 1976 negotiations and agreements, and was in force when the alleged violation occurred.

Both Exh. J–2 and J–4 also include a pamphlet summarizing the main features of the pension plan, but there is no question in this case that anything other than the full text of the plan is controlling.

Although the 1976 Pension Plan, in Section 25, reserves to Westinghouse the right to amend the Plan, to discontinue contributions or to terminate the Plan (subject to conditions required to comply with ERISA), this reservation is subordinate to the covenant of Westinghouse, in Art. I, sec. 4(b) of the collectively bargained Pension and Insurance Agreement, that it will not discontinue the Pension Plan or make any amendment that would adversely affect the rights thereunder of the employees, nor suspend or reduce company contributions, during the term of the Agreement.

Both the original complaint and the amended complaint allege, in substance, that Westinghouse willfully violated sec. 4(a) of the ADEA, 29 U.S.C. § 623(a) by its failure to provide "severance pay" to terminated employees age 55 and older who had 10 years service with the Company when it closed its Belleville, N.J. plant on April 1, 1977 and who were then eligible for retirement benefits.

The original complaint named a single employee in that category, and a number of "John Doe" employees similarly situated. The amended complaint names 65 individual employees and no "John Does".

After careful review of the full text of the documents Exh. J–1 through J–4, the court suggested at a later argument that the applicable provisions clearly did not allow an employee to have both Layoff Income and Benefits under Article VI of the Pension and Insurance Agreement and retirement payments under the Pension Plan in light of the general layoff due to the closing of the Belleville plant. It suggested that a correct reading of the interrelated instruments meant that an employee over 55, with 10 years service, who was laid off due to the plant closing, was put to his own choice whether to take early retirement and begin receiving payments for retirement under the Pension Plan, or whether to exercise one of the options under the Layoff Income and Benefit plan, which was to sever all relationship with the Company, relinquish his recall and service rights, and take a lump sum payment equal to one week's pay for each full year of credited service (less any part of that total that had been applied to layoff income on some earlier layoff and not meanwhile repaid or rebuilt).

Aside from the option to sever all relationships and relinquish recall and service credits in order to draw a lump sum payment (which, incidentally is not available for every layoff but only under specified conditions), the Layoff Income and Benefit plan is an unemployment benefit plan designed to supplement unemployment compensation benefits to bring the combined payment up to 60% of the level of his "week's pay" (a defined term), and to continue such payments after unemployment compensation had run out (until the particular employee's maximum credit was used up).

The court suggested that if this was the correct reading, there would be no conceiv-

able ADEA violation because the choice between one course or the other was the employee's choice, not the employer's. Supplemental briefs were requested based on that reading.

After the supplemental briefs and responses were in, the court was of the view that the question it had raised had gone unanswered, and on March 17, 1982 it filed a brief memorandum to the effect that the suggested reading was the correct one, that there accordingly could not be an ADEA violation, and ruled that EEOC's motion would be denied while the Westinghouse motion would be granted. It promised a fuller articulation as soon as the press of other work allowed. No order was entered at that time.

EEOC then filed a motion to alter or amend the memorandum. This amounted to an application for reconsideration and reargument, and was timely filed. Further briefs and responses were submitted by both sides, and further argument heard.

It was evident from that argument that EEOC agreed that the subject employees could not have both LIB and early retirement payments at the same time under the facts of this case. Westinghouse also agreed that an employee could not have both, but also was of the view that so long as the employee was eligible to begin receiving payments for early retirement, he could not exercise the LIB option for a lump sum payment. It also urged that the court deal with other defenses pressed to support its motion for summary judgment.

The present opinion is the fuller articulation contemplated when the earlier brief ruling on one issue was filed. It replaces that earlier memorandum since some aspects have been made clearer by the further briefing and argument, and another review of the file and the exhibits. It also deals with other defenses raised and argued.

1. *Statute of limitations.*

The ADEA does not itself spell out the applicable statute of limitations. Instead, the Congress merely provided, in 29 U.S.C. § 626(e), that "Section[s] 6 * * * of the Portal-to-Portal Act of 1947" 29 U.S.C. § 255 "shall apply to actions under this Act."

That embodied statute provides that any action may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of action arising out of a willful violation may be commenced within three years after the cause of action accrued.

This action was commenced when the original complaint was filed on March 28, 1980 as to the one employee then named. His situation will be considered first. Since a "willful" violation is alleged, the 3-year period will be considered first.

The affidavit of John F. Williams, submitted in support of the Westinghouse motion, shows that Mr. Meola, the only named employee in the original complaint, was counselled on February 2, 1977 that he was ineligible for LIB. There is no affidavit or other fact source to contradict this fact, or to raise any issue for trial in respect to the date.

That date is more than 3 years before the original complaint was filed on March 28, 1980, and thus is barred by the longer statute of limitations set out in 29 U.S.C. § 255, so long as it is the date on which the "cause of action accrued."

EEOC argues that the cause of action did not accrue until April 1, 1977 when the Belleville plant closed and Mr. Meola was laid off and put on early retirement. It says that not until April 1, 1977 would Mr. Meola have been entitled to be *paid* any LIB benefit, and so the complaint was filed within three years.

There are several difficulties with EEOC's position. In the first place, if Mr. Meola were entitled to claim LIB, he would have had to choose the option for a lump sum payment, in which case he could not have begun to draw payments on early retirement, as noted above. In fact, both the complaint and amended complaint are

drawn on the incorrect assumption that Mr. Meola was entitled both to choose a lump sum payment and to draw payments for early retirement, which is not the case. This erroneous assumption began at the start, when Mr. Meola's son submitted a charge to the Department of Labor on April 14, 1977 (this is when administration of ADEA was in that Department and before reassignment to EEOC). That charge says, in pertinent part:

" * * * Employees eligible for early retirement apparently are not receiving severance pay [sic]. * * * On the surface, this would appear to violate ADEA with regard to workers who, *although receiving pensions*, are not paid severance benefits." (emphasis added). (Exh. N to EEOC brief for summary judgment).

▮ Since Mr. Meola was told on February 2, 1977, that he would be put on early retirement and was ineligible for LIB, the alleged ADEA violation (if there were one) occurred then and so the "cause of action" arose then.

The core of the ADEA applicable to this case is the declaration of "unlawful" employer practices, 29 U.S.C. § 623(a). This embraces discrimination "against any individual in respect to his compensation, terms, conditions, or privileges of employment" or to "discharge any individual" because of such individual's age.

Thus, what the ADEA forbids is to *discriminate because of age*. If there were discrimination here on account of age, it occurred when Meola was told that he would have early retirement and was ineligible for LIB. That was on February 2, 1977, more than 3 years before the complaint was filed.

The analysis is the same as that employed by the Supreme Court in *Delaware State College v. Ricks*, 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), a case from this Circuit. In that case, which involved a charge of race discrimination in employment, both under 42 U.S.C. § 2000e et seq. (Title VII) and under 42 U.S.C. § 1981, Ricks was told on June 26, 1974

that the college Board of Trustees formally voted that day to deny him tenure. He remained in employment until June 30, 1975 when his non-tenured employment ended.

In the case of the Title VII claim, the requirement was that a complaint be filed within 180 days "after the alleged unlawful employment practice occurred". In the case of the § 1981 claim, which was governed by Delaware law, the provision was that "No action ... shall be brought after the expiration of 3 years from the accruing of the cause of such action;" 10 Del.C. § 8106 (see 605 F.2d 710 at 713).

For both claims, the Supreme Court ruled that the several periods applicable (180 days and 3 years) ran from the date Ricks was told of the Board action to deny him tenure, even though he continued to be employed for more than a year thereafter as a non-tenured teacher.

There is not, and cannot be, any claim here that Mr. Meola's layoff was a discriminatory act or practice in violation of the ADEA. The plant was closed and all employees were laid off (except, perhaps a security staff), and they were of all ages.

This is not a case like *EEOC v. Baltimore etc. Co.*, 632 F.2d 1107 (CA 4, 1980). There, two railroads with consolidated management faced severe financial difficulties as the result of a nationwide coal strike in 1971. To meet the problem, the company decided to reduce the size of its work force. First, they reduced the number of workers subject to collective bargaining agreements. That step was not challenged in the case. Next they reduced the number of workers not subject to collective bargaining agreements, and this was done by selectively terminating 142 employees who were at least 60 years old with 20 years' service, or at least 62 years old with 10 years' service. All of them were qualified for retirement pensions, and were involuntarily retired starting in October, 1971. Under the pension plan, only those who reached 65 were subject to compulsory retirement. Those eligible to retire earlier

were not compelled to retire so far as the plan was concerned, but it was shown that such early retirements were compelled as an inherent right of management in managing the business, in managing personnel, a right that the company had "irrespective of the plans." Thus, in that case, the company thinned out its work force by selecting employees according to age.

Nothing of that sort appears in the present case. There is no dispute that the entire Belleville plant was closed down and all employees laid off.

Thus, the core of the alleged discriminatory practice is the denial of LIB, not the layoff. If it violated the Act, that event occurred, as in *Ricks*, when Meola was told that he would be put on early retirement and was not eligible for LIB. If that was a prohibited practice, the violation occurred and the cause of action accrued, on that date as it did in *Ricks* for application of the Delaware 3-year statute as well as for the Title VII claim.

The same result follows for all the other employees named in the Amended Complaint, which was filed March 3, 1981. As the Williams affidavit shows, and it is in no way controverted, every one of the named plaintiffs (except two who were not retired) was told, as Mr. Meola was, that they would be placed on early retirement and that they were not eligible for LIB, on various dates specified, the earliest being January 13, 1977 and the last ones being on March 16, 1977. All but 3 were so told in January and February, 1977, and all were so told more than three years before the original complaint was filed.

Of course, if the 2 year period applies under 29 U.S.C. § 255, the original complaint was more than a year late. However, it is not necessary to select between the 2 and 3 year periods, which turns on whether the alleged violation was "willful", because the result is the same in either case.

While the complaint alleges willful violations, no evidence in that regard was submitted on the motions for summary judgment except to the extent that Westing-house presented proofs to show there was no unlawful practice at all. If "willful" violations were to be considered, both for statute of limitations purposes and for the purpose of claiming liquidated damages, 29 U.S.C. § 626(b), such an issue seems to be one for trial rather than motion. However, the bar of the 3-year statute renders the issue moot for both purposes.

## 2. *The documents.*

A collective bargaining agreement was entered into between Westinghouse and I.U.E. as of October 1, 1950. It embraces all matters then negotiated and agreed to between the employer and the union on a companywide basis for all employees for whom the Union, or one or another local of the union, is the certified collective bargaining representatives.

This agreement, which may be regarded as a national agreement for Westinghouse, was evidently worked out by a committee of 12 on each side. It is retained as the basic, underlying set of terms and conditions for the entire company, including such broad matters as strikes, stoppages and lockouts, union shop provisions (subject to compliance with local laws), dues checkoff, certain broad aspects of wages (but not wage schedules), hours of work, overtime, holidays and vacations, seniority, leaves of absence, grievance and arbitration, and the like.

Wage schedules are negotiated locally, and other details are handled by local unions, including the processing of grievances but arbitration is handled on a national basis by I.U.E.

The 1950 Agreement is periodically modified by adjustments negotiated by the committees of 12 on a companywide basis, and these appear as a "supplement", such as the 1976 Supplement to the 1950 Agreement, which dealt with certain increases in rates of pay negotiated for the company as a whole, including a set of formulas for cost-of-living increases, and the like.

Changes in provisions of the 1950 Agreement are incorporated within the body of

that document, which is evidently re-executed at the same time as each Supplement.

The combination of the 1950 Agreement as modified and the current supplement is followed by an "Appendix" which lists the location and identity of each local bargaining representative, and describes the composition of the employees included in that bargaining unit. For the 1976 documents, there are 41 locals and units listed.

There then follows an Appendix B, listing locations and representatives at which the "union shop" provisions apply, and the original effective date of that status (or the date of certification).

At the time of each national or companywide negotiation over the 1950 Agreement and its current supplement, there is negotiated a separate but related document, the "Pension and Insurance Agreement", between Westinghouse and I.U.E. The locals are covered, but this agreement is companywide with no provision for local supplements.

The subject dealt with embraces employee benefit plans, both welfare benefit plans and pension benefit plans. These terms are as defined by the Congress, first in the Welfare and Pension Plan Disclosure Act of 1958, and then by the Employment Retirement Security Act of 1974. For the definitions, see 29 U.S.C. § 302(a)(1) and (2) (WPPDA) and 29 U.S.C. § 1002(1) and (2) (ERISA). Both definitions include unemployment plans, such as LIB, under "welfare benefit plans".

The 1976 Pension and Insurance Agreement by Art. I, requires the company to put into effect an "insurance plan", Section 2(a) and (b), to make available a "pension plan", Section 2(c), (d) and (e), to make available a "savings plan", Section 2(f) and (g), and to put into effect a "personal accident insurance plan", a "disability benefit plan", a "dependent life insurance plan", and an "in-hospital indemnity plan", Section 2(h) through (l). The "insurance plan" evidently includes coverages for life insurance, accidental death or dismemberment, accident and sickness, personal hospital expense, personal surgical, major

medical, hospital expense and the like, see Art II, Section 3(d).

After provisions dealing with one or another of these plans, Article VI establishes the Layoff Income and Benefit plan (LIB) which is the focus of this lawsuit, and which will be reviewed in some detail later. It is sufficient for the moment to observe that it is designed as a supplement to unemployment compensation benefits in the event of layoff for lack of work. As EEOC insists, it is not a "pension plan" as that term has been defined by both WPDA and ERISA, but as EEOC overlooks, it is clearly a "welfare plan" as defined in both statutes.

It is followed by Article VII, dealing with an educational opportunity program providing tuition and fee benefits for training courses to maintain or improve skills for the job or for career development within the company.

There are no doubt other instruments in existence in respect to the various benefit plans dealt with by the agreement, and a number of them are referred to in it. They are not among the exhibits supplied except for the pension plan as it stood under the 1966 agreement (Exh. J–2) and as it stood under the 1976 agreement (Exh. J–4).

The pension plan, and the LIB plan expressed in Article VI, read in the context of all the agreements, contain the provisions mainly to be considered to resolve the issues raised.

It should be noted, too, that all these plans and their terms are the result of collective bargaining. The provisions of the bargained agreement for the pension plan are especially worth noting. These are found at Article I, Section 2(c), (d) and (e) of the 1976 Pension Plan and Insurance Agreement.

Paragraph (c) is the agreement of the company to make the pension plan as negotiated available, but the agreement is subject to approval of (1) the Board of Directors and (2) the Commissioner of Internal Revenue.

Paragraph (d) requires that the negotiated pension plan is to be submitted to the Board within 30 days, and if approved then to the Commissioner, and if approved it is to take effect.

Paragraph (e) specifies that if the Board fails to approve the negotiated plan, then under a specified time schedule "the Company and the Union shall be obligated to meet to negotiate solely with respect to the subject matter of the Pension Plan ..." A like provision is found in paragraph (g) for the savings plan, which also is subject to approval by the Board and the Commissioner. These provisions emphasize the collective bargaining nature of the pension plan.

It should also be observed that there is interplay between the Pension Plan and other collectively bargained agreements. For example, Section XII of the 1950 basic collective bargaining agreement, in dealing with seniority, defines "accumulated length of service" in terms of the years, months and days accumulated as "Credited Service under the Westinghouse Pension Plan". It also ties in with LIB, by excluding credit for service "that was relinquished by his election to receive the Lump Sum Option payment provided under the Layoff Income and Benefits Plan".

Similarly, the LIB plan, in defining an "eligible employee", refers to one "who is not entitled to early retirement, as specified by the Westinghouse Pension Plan".

Also, the Pension Plan, in Section 2, C–3 and D–2, ties in with the LIB plan insofar as the making of a Lump-Sum payment related to length of service solely because of layoff bars eligibility for early or selected retirement, and ties in with the basic collective bargaining agreement insofar as the existence of contractual employment rights at another Company location, or the offering of employment at another Company location, bars retirement eligibility.

These, and other interlocking provisions as well as the recitals at the start of the Pension and Insurance Agreement, emphasize the fact that the content and terms of the basic collective bargaining agreement as well as of the Pension and Insurance Agreement (including the LIB plan) and the various plans, such as the pension plan, are not unilaterally determined by the employer but are the consequence of collective bargaining. For that reason, the various interlocking terms are not only to be read together but are to be afforded the deference due to such agreements in the interests of labor peace, the polestar of federal labor law as developed by the federal courts.

In related contexts the Supreme Court has taken pains to emphasize the considerable weight to be given to the substantive terms of a collective bargaining agreement. In *United Mine etc. Funds v. Robinson*, 455 U.S. 562, 102 S.Ct. 1226, 71 L.Ed.2d 419 (1982), it rejected a challenge to the terms of alterations in eligibility and benefit levels for health coverage under trusteed employee benefit plans where those terms were fixed by a collective bargaining agreement to which the trustees were obliged to adhere. [Challenge to terms based on alleged violation of § 302(c)(5) of the Labor Management Relations Act of 1947, 29 U.S.C. § 186(c), which forbids transfers between employers and employee representatives, with an exception for payments to a trust fund established by the representative "for the sole and exclusive benefit of employees", etc.].

Similarly, in *American Tobacco Co. v. Patterson*, 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982), the court rejected a contention that seniority systems adopted or modified after the enactment of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., were not protected by the provisions of § 703(h) of the Act, 42 U.S.C. § 2000e–2(h). It noted that its earlier rulings in *Teamsters v. U.S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), in *Trans World Airlines v. Hardison*, 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) and in *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) established that § 703(h) on its face immunizes all bona fide seniority systems, with no distinction between those adopted before or after its effective date. It ob-

served that seniority provisions are universally included in collective bargaining contracts, and that the collective bargaining process "lies at the core of our national labor policy." It noted that Congress was well aware in 1964 that the purposes of Title VII inevitably would, on occasion, conflict with the policy favoring minimal supervision by courts and other governmental agencies over "the substantive terms of collective bargaining agreements," and that Congress struck a balance between those policies in enacting § 703(h). The Court declined to upset that balance.

### 3. *The pertinent ADEA provisions.*

The prohibitory provision of ADEA involved in this case declares that:

"It shall be unlawful for an employer ... to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's age;" 29 U.S.C. § 623(a)(1) (1967)

The same section, as part of the definition of forbidden conduct, also provided that:

"It shall not be unlawful for an employer ... (1) to take any action otherwise prohibited ... where the differentiation is based on reasonable factors other than age; (2) to observe the terms of a bona fide employee benefit plan, such as a retirement, pension, or insurance plan which is not a subterfuge to evade the purposes of this Act ..." 29 U.S.C. § 623(f) (1967).

It should be observed that at the time (1967), the only significant federal statute dealing with employee benefit plans (other than provisions of the Internal Revenue Code dealing with whether any such plan was "qualified" for income tax purposes) was The Welfare and Pension Plan Disclosure Act (1958) (WPPDA), which divided employee benefit plans into two classes: welfare benefit plans and pension benefit plans. See 29 U.S.C. § 302(a)(1) and (2), repealed. Pension plans were defined as those providing retirement benefits, including profit-sharing plans providing benefits at or after retirement. Welfare plans were defined as those providing medical, surgical, or hospital care or benefits, or benefits in the event of sickness, disability, death or unemployment.

WPPDA was merely a reporting and disclosure Act; it did not purport otherwise to regulate any employee benefit plan. That change occurred with ERISA, 29 U.S.C. § 1001 et seq., P.L. 93–406, September 2, 1974. Its definitions are much the same, see 29 U.S.C. § 1002(1), (2) and (3).

Both the LIB plan and the Westinghouse Pension Plan are employee benefit plans, the first being a welfare benefit plan since it provides insurance for unemployment, and the other being a pension benefit plan. Both are within § 623(f).

The interplay between § 623(a)(1) and § 623(f) was considered by the Supreme Court of the United States in the first case involving the Act that came before it, *United Air Lines v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977).

The majority opinion in that case held that on its face, and without need to look to legislative history, the Act did not forbid the involuntary retirement of an employee who reached his 60th birthday when that requirement was in accordance with a retirement plan. The plan was regarded as bona fide in that it actually existed and paid pension benefits, and the court held it could not be claimed to be a plan adopted as a "subterfuge" when it had been established in 1941, long before the 1967 enactment. It rejected any *per se* rule requiring an employer to show an economic or business purpose in order to satisfy the "subterfuge" language of the Act.

Justice Stewart concurred in the judgment on the ground that since the plan was bona fide, it was not possible for it to be a subterfuge when adopted long before the 1967 act was even contemplated, and would address no other questions discussed in the majority opinion.

Justice White concurred in the judgment and with Justice Stewart. He differed to

the extent that he felt that the question of "subterfuge" should be examined in terms of the maintenance of the plan after the 1968 effective date of the Act. He, too, found no support for any requirement that the employer be called upon to show "some economic or business purpose". He read the intent to be to exempt all retirement plans—including those whose only purpose is to terminate the services of older workers—as long as the benefits they pay are not so unreasonably small as to make the "retirements" nothing short of discharges. He regarded the no-subterfuge requirement as merely a restatement of the bona fide requirement.

He pointed out that all retirement plans necessarily make distinctions because of age, and so felt that the subterfuge language could not have been intended to impose a condition which almost no retirement plan could meet. He would have regarded the exception as protecting action taken pursuant to a retirement plan which is designed to pay substantial benefits, without regard to its adoption before the Act.

Two members of the Court dissented in an opinion by Justice Marshall. They regarded the exemption as capable of supporting two interpretations: one, to allow involuntary retirements (as held by the majority) and two, to allow different treatment of older employees only with respect to the benefits paid or available under employee benefit plans, including pension and retirement plans.

This court, of course, is obliged to follow the law as laid down by the majority in that case.

## 4. *The LIB and Pension Plans.*

█ The issue in the present case arises out of the fact that among the various employee benefit plans provided for Westinghouse employees, there is an insurance plan to supplement unemployment compensation, and it is interrelated in some respects with recall rights and service credits (seniority) under the basic collective bargaining agreement, and with the pension plan as well.

This insurance plan to supplement unemployment compensation is rather complex and will be reviewed in some detail later. For present purposes it is sufficient to note that it establishes a credit, called a "Total Maximum Sum," for each employee, equal to one week's pay (as defined) for each full year of service with the Company. That credit is made available for receiving "Layoff Income and Benefits", according to which of a number of options is selected by the employee, if he is "eligible" to receive them.

At the time of the pertinent events here, an "eligible employee" was defined as an employee

... with two (2) or more full years of such service

... who is not entitled to early retirement, as specified in the Westinghouse Pension Plan, and

... [who] is not on disability or leave of absence

who is laid off through no fault of his own for lack of work occasioned by reasons associated with the business (such as

... changed customer ability and willingness to buy as reflected in adjusted production requirements

... changed manufacturing processes

... product discontinuance or

... plant closing) and

who has not returned to work.
(Art VI, Section 1(a), of the "Pension and Insurance Agreement" entered into between Westinghouse and the I.U.E. July 12, 1976, Exh. J–3)

The Westinghouse Pension Plan, which contains both non-contributory and contributory portions, defines the conditions of eligibility for retirement and pension at a "normal", "early" and "selected" retirement date. References hereafter are to the Plan, Exh. J–4.

Normal retirement date is the first day of the month following the month in which the employee's 65th birthday occurs. For

example, if the 65th birthday falls on any day in May, from the 1st to the 31st, the defined normal retirement date is June 1st. Pension payments begin on that date, and the employee is considered terminated the day before (May 31st). Employees so retired receive a pension so long as they were employed on the day before the retirement date and began employment before the first day of the month following his 60th birthday. Section 2–A.

The Plan definitions using the first day of a month are evidently intended to simplify administration and while they must be used in applying the Plan, they are not pertinent to any issue here. For easier understanding, the court will merely refer to specified ages such as age 65 or age 60, with the understanding that the references to the first day of a month are being omitted.

Early retirement may occur in several ways.

1. An employee with at least 10 years of credited service may retire at any time after age 60 and before age 65 on reduced pension. He must apply for early retirement at least 30 days before the desired date, except that in the event of a layoff, the 30 day requirement is waived. To preserve benefits for a surviving spouse in the event of death before retirement, a death after age 50 but before age 65 is treated as an early retirement at death. Section 2–C–1.

2. If an employee has at least 10 years but less than 30 years credited service, and is laid off after age 59 and before age 60, he is allowed to take early retirement at age 60 on reduced pension. He must apply before his 60th birthday to have this option. He is not eligible for this option if (a) he has returned to regular service before his 60th birthday or (b) he has received a lump sum payment related to length of service solely because he was laid off or separated. Section 2–C–2.

3. If an employee has at least 10 years of credited service, and is laid off *as a result of a Location Closedown* after age 55 and before age 60, he is allowed to take early retirement at reduced pension. He must apply within 60 days after the layoff. He is not eligible for this option (a) if he has contractual employment rights at another location or (b) if he is offered employment at another location or (c) if a lump-sum payment related to his length of service has been made solely because of the layoff. An employee who qualifies for early retirement under 2, above, may retire under that provision instead of this one. Section 2–C–3.

Another form of early retirement is called "Selected Retirement". There are two versions of this, both limited to employees having at least 30 years of credited service.

1. An employee with at least 30 years of credited service may retire anytime after age 58 and before age 65 at a reduced pension. He must apply for selected retirement at least 30 days before the desired date, except that in the event of a layoff, the 30 day requirement is waived. To preserve benefits for a surviving spouse in the event of death before retirement, a death after 30 years' service is treated as an early retirement at death. Section 2–D–1.

2. If an employee has at least 30 years of credited service, and is laid off *as a result of a Location Closedown* after age 55 and before age 60, he is allowed to take selected retirement at a reduced pension. He must apply for this retirement within 60 days of the layoff. He is not eligible for this option (a) if he has contractual employment rights at another location, or (b) if he is offered employment at another location, or (c) if a lump-sum payment related to his length of service has been paid solely because of the layoff see 2–D–2.

There is another provision in the Plan for deferred retirement. This only applies under exceptional circumstances and also depends on a request by the employer to continue in active service after age 65 and the agreement of the employee to do so. It is not involved in the present case.

Analyzing the above provisions from another perspective, they spell out a plan under which:

1. Normal retirement is at age 65, with a pension so long as employment began not later than age 60.

2. Employees with at least 10 years service may take early retirement between 60 and 65 at reduced pension. If death occurs after age 50, benefits for a surviving spouse are protected.

3. Employees with at least 30 years service may take early retirement between 58 and 65 at reduced pension. Protection of benefits for a surviving spouse arises with the 30 years service even if death is before age 50.

4. Employees with at least 10 years service may take early retirement at age 60, at reduced pension, but only if laid off (for any reason) between ages 59 and 60. This option does not apply if the employee returns to work (after the layoff) before age 60. It also does not apply if he received a lump sum payment related to length of service solely because he was laid off or separated. Notice requirements are waived in case of layoff.

5. Employees with at least 10 years service who are laid off *as a result of a Location Closedown* after age 55 and before age 60 may take retirement at reduced pension. He must apply within 60 days of the layoff, and the retirement takes effect on the first day of the month after he applies. Such employees may not retire under this provision (a) if they have contractual employment rights at another location; or (b) if they are offered employment at another location, or (c) if they have been paid a lump-sum related to length of service solely because of the layoff.

The issue posed in this case arises out of the bar to early or selected retirement, otherwise available to an employee between the ages of 55 and 60, in the event of the payment of a lump sum related to length of service, solely due to a layoff, and a corresponding provision in the Pension and Insurance Agreement controlling eligibility by way of unemployment insurance supplements. (the LIB plan)

All of the employees on whose behalf EEOC sues were laid off as the result of a Location Closedown. All are ' receiving retirement pension payments, and so all are taken to have been at least age 55, with at least 10 years' service at the time and not to have had contractual employment rights at another location and not to have been offered employment at another location.

They did not, however, receive what EEOC calls "severance" payments or benefits, and it is this item that forms the basis for the ADEA claim.

In fact, there is no such simple item as "severance" payments or benefits. Rather, there is a benefit plan to supplement unemployment insurance, mentioned briefly above, which must now be examined in some detail. References are to the Pension and Insurance Agreement, Exh. J–3, mentioned above.

That agreement is a collectively bargained agreement entered into by Westinghouse and I.U.E. at the same time as and collateral to the main collective bargaining agreement that deals with the usual subjects. It deals with a variety of different kinds of employee benefits, such as the pension plan (discussed above), life insurance, accident insurance, hospital insurance, a savings plan, and the like. Taken together they are all employee benefit plans, most being welfare benefit plans and one being a retirement and pension plan, as those terms were defined by WPPDA, 29 U.S.C. § 302 and now by ERISA, 29 U.S.C. § 1002.

The plan at issue is a plan for what is called "Layoff Income and Benefits", and it is spelled out in Art. VI of the Pension and Insurance Agreement of 1976.

The Layoff Income and Benefit plan applies only when there is a layoff of an employee

... who has 2 or more full years of service

... who is not entitled to early retirement as specified in the Westinghouse Pension Plan

... who is not on disability or leave of absence

... who is laid off through no fault of his own for lack of work, and

... who has not been recalled to work.

An employee who meets these conditions is an "Eligible Employee" for Layoff Income Benefits (LIB).

He will receive benefits in accordance with stated options, from a Total Maximum Sum available to him equal to 1 week's pay for each full year of his service with the company. The amount of a "week's pay" is expressly defined for salaried, daywork, and hourly paid incentive workers.

The total maximum sum is also affected by prior layoffs and rehires subject to repayment and rebuilding of the amount after rehire, but in any event will be no less than 4 weeks' pay.

In the special case of a layoff which the Company management believes will last more than 6 months, an employee eligible for LIB may elect Option (a) under Section 3. To exercise that option he must, within 60 days after the layoff,

... permanently sever his relationship with the Company,

... relinquish recall rights and service rights (except as may exist under the Pension Plan).

Upon doing so, he will receive the Total Maximum Sum available to him in a Lump Sum Payment (together with vacation pay and any other sums due him) [Note: It is this Lump Sum option, if exercised, that EEOC evidently refers to as "severance pay".] If he has vested rights under the Westinghouse Pension Plan, he may elect not to withdraw his pension contributions, if any.

If the layoff is expected to exceed 6 months and an eligible employee does not exercise Option (a) within 60 days of the layoff, or if the layoff is not expected to exceed 6 months, then the Lump Sum Payment provision in Option (a) is not activated and is not required to be made. The same is true of employees laid off who are not eligible employees as defined in Section 1(a), i.e., less than 2 years of Credited Service, or entitled to early retirement under the Pension Plan.

Where Option (a), if applicable, is not exercised, or where Option (a) is not applicable, an eligible employee may apply for weekly benefits under Option (b). Under this option, he is paid a benefit in an amount sufficient to make up the difference between what he receives as unemployment compensation payments and 60% of his week's pay. If his unemployment compensation payments run out, then he is paid under the Plan 60% of his week's pay, until the Total Maximum Sum is exhausted, or until 12 months have elapsed since his layoff. These benefits to supplement unemployment compensation are subject to various limitations:

... they are not paid for any "waiting week"

... they are not paid for any week in which he is entitled to payments (a) for accident and sickness benefits, or (b) for total and permanent disability benefits (both under the Westinghouse Insurance Plan); or (c) under any worker's compensation law; or (d) under any temporary disability law

... they are not paid for any week in which he is entitled to weekly retraining allowances under State or federal law

... they are not paid for any week in which he is not in fact unemployed

... they are not paid after age 60 to an employee who had at least 10 years' service and was laid off on or after his 59th birthday.

Under Option (c), if the Company has not offered reemployment to an eligible employee by the end of 1 year after layoff, any balance then remaining from the Total Maximum Sum for that employee is paid to him provided he was not laid off within 1 year of the time he would have become eligible for early retirement under the Pension Plan.

The number of weeks for which unemployment compensation is payable has varied from time to time. Assuming that peri-

od as 26 weeks, and assuming the benefits equal 60% of a week's pay (so as not to call for any draw on the Total Maximum Sum during that time), an eligible employee would need a credit of 15 to 16 week's pay (representing 15 to 16 years' service) in order to have the 60% benefit payments last out the remaining 26 weeks of the year. Of course, if the unemployment compensation benefits do not reach the 60% level, some part of the Total Maximum Sum will be applied to supplemental benefits during those 26 weeks, and something more than 15 to 16 year's service, and corresponding weeks' pay, would be needed to last out the 12 month period.

Reading together the specified terms of the Pension Plan and of the LIB plan, as they must be because they are interlocked, the court considers the position of an employee who is 55 to 59 at layoff to be as follows:

A. If the layoff is expected to last more than 6 months but is not the result of a Location Closedown, he may exercise Option (a), sever his relationship, relinquish recall and service rights, and elect to be paid his Total Maximum Sum as a Lump Sum Payment.

B. Under the same conditions, he may elect not to sever, relinquish or draw down a Lump Sum Payment but instead take Option (b), receiving weekly supplements to unemployment compensation benefits or extensions after they run out, until the Total Maximum Sum is used up, and then Option (c).

C. If the layoff is not expected to last more than 6 months, and is not the result of a Location Closedown, he may not exercise Option (a). He may exercise Option (b) and, if 12 months go by and he has not reached age 60, may draw any balance under Option (c).

D. If the layoff is expected to last more than 6 months, and is the result of a Location Closedown, he will need to decide within 60 days of the layoff whether to exercise Option (a) by severing, relinquishing and being paid the Total Maximum Sum as a Lump Sum Payment, or whether instead to take early retirement under the Pension Plan, also within the same 60 days.

If he files application for early retirement, then, having been eligible he becomes *entitled* to early retirement and by definition cannot be an "eligible employee" under the LIB plan at all.

On the other hand, if he files application for the lump sum payment under Option (a), that fact will disqualify him for early retirement. The options are mutually exclusive.

The point was raised at argument on several occasions, and both EEOC and Westinghouse have agreed that the employee could not receive both the lump sum payment *and* early retirement.

This being so, the court fails to see how there can be any discrimination because of age in violation of ADEA in view of § 623(f). Both the LIB plan and the Pension Plan are "employee benefit plans" as used in that section. The same terms were used in WPPDA, also part of Title 29, in 1958 and the Congress had to be familiar with them when it enacted ADEA in 1967.

In fact, the filed charge that began the inquiry that led to the present suit was filed by the son of an employee over 55, who was receiving early retirement payments, and complained of age discrimination on the ground that he did not receive "severance pay" *as well*. The charge claimed entitlement to *both*, but there is no entitlement to both. Read as the court has read them above, the employee is at best eligible only for one or the other, but not both. The court considers the choice to be that of the employee, such that by choosing one he cannot have the other. Since the choice is his to make, no ADEA charge can be advanced against the employer.

EEOC argues that the reduced monthly pension on early retirement is a smaller periodic amount than the 60% benefit. That may be, and it would be unusual if it were not because the sum available for retirement payments will need to be paid out over a longer span when early retirement is taken. The actuarial aspects of

annuities, combined with the data in standard mortality tables, make this inevitable. The same is true of early retirement at 60 instead of normal retirement at 65, even if no layoff is involved.

The point that EEOC overlooks is that if the employee chooses Option (a), which it calls "severance pay", he can no longer take early retirement. His interest in the plan is vested, of course, under ERISA as well as under the Plan, but he would not be able to draw down retirement payments until age 65. He may not live to 65, and may never draw pension benefits. Some, if not most, may well feel that it is best to take the reduced payments for early retirement and be assured of receiving them for a longer span (whatever that span turns out to be). Mortality tables reflect the experience of very large numbers of lives, and provide no assurance that any individual will in fact live out the experienced span for his age.

Westinghouse concurs in the result, but disagrees with the court's construction of the terms of the LIB plan and the Pension Plan. Its position is that throughout the entire combined history of LIB and the Pension Plan (and both have existed since well before the enactment of ADEA), they have been uniformly construed and applied so that an employee "eligible" for early retirement under the Pension Plan is simply not an "eligible employee" for LIB. Under this construction one eligible for early retirement has no choice in case of layoff. He is put on early retirement, and that fact bars his eligibility for LIB benefits.

If this be the correct construction, it would need to be on the basis of other considerations than the language involved, such as the context and history of the provisions, the practical construction over the years, the law of the shop, and the like. It may rest in part on the provisions of Option (c) which do not allow payout where layoff occurs within 1 year of when the employee becomes "eligible" for early retirement.

It is not necessary for the court to say that one or another construction is the correct one. The I.U.E., which is the exclusive bargaining agent for the employees it represents is not a party, and besides that a disagreement over construction in this sense is probably a subject for grievance and arbitration, not for judicial determination under the principles of federal labor law.

The fact remains, however, that even if the Westinghouse construction be assumed, there is no ADEA violation under the facts of this case. The reason is that the layoff was the result of closing a plant. That event laid off employees of a wide variety of ages, and with different consequences for employees of the *same age*. The differences in consequences are due not to age but to other factors in the LIB and Pension plans.

An employee aged 56 who was laid off but did not have 10 years service credits was eligible for LIB benefits, including Option (a), but could not have early retirement. Another of the same age with at least 10 years service credit received early retirement under the Westinghouse construction and was therefore not eligible for LIB benefits, the latter being a point on which all parties agree.

A third employee of the same age, with more than 10 years service, would not be eligible for early retirement if he had contractual employment rights at another location or if he was offered employment at another location. In that case, if he were laid off for a period of time he would evidently be eligible for LIB benefits during unemployment under Option (b), and if his layoff was expected to last more than 6 months, could have exercised Option (a) for a lump sum benefit, but, in that event would have severed himself from the company, relinquished his recall and service rights and doubly barred his eligibility for early retirement.

The typical retirement and pension plan inevitably takes account of age. This was one of the points of Justice White's concurring opinion in *United Air Lines*, supra,

when he observed that all retirement plans necessarily make distinctions based on age. The desirable goals of actuarial soundness and full funding, to help achieve which ERISA was enacted, cannot be achieved without differences that take account of age. It was in recognition of that basic fact of life and death that § 623(f)(2) was included in the Act.

As the second analysis based on the Westinghouse construction shows, there are different consequences to employees of the same age, due to conditions in these two inter-related benefit plans that reflect factors other than age.

It also cannot be overlooked that both plans are negotiated plans hammered out at the bargaining table. Under the plan as it stood in 1966, and under the LIB plan of that date, Exh. J–1 and 2, there was no provision for early retirement at age 55.

Normal retirement was at 65, Section 2–A. Early retirement was allowed in two forms, both requiring 10 years' service: (1) an optional retirement at any time after age 60 and before 65; and (2) a mandatory retirement at age 60 for those laid off after age 59 and before age 60, provided he was not returned to regular service before age 60 and provided he had not received a lump sum payment related to length of service solely because he was laid off or separated. Selected retirement, another form of early retirement, was allowed at any time after age 62 and before 65 for those with at least 30 years service.

These terms were obviously liberalized in 1976 as the result of collective bargaining and as liberalized now provide for early retirement as low as age 58 (instead of 62) for those with 30 years service, and as low as age 55 if laid off by a Location Closedown with at least 10 years of service.

The considerable reliance placed on the collective bargaining process as an important instrument for industrial peace is now firmly embedded in federal labor law as fashioned by the Supreme Court. The liberalization of benefit plans of one kind or another by means of that process is hardly to be disturbed through the judicial process by the strained interpretation of a statute, like ADEA, which expressly exempts conduct in compliance with bona fide benefit systems of the kind involved here.

5. *The alternate constructions.*

As noted above, the court reads the terms of the LIB plan and the Pension Plan differently than does the employer.

The court's construction sees options in employees who are laid off due to a plant closing (Location Closedown) and who are then at least age 55 and have at least 10 years' credited service, but who do not have contractual employment rights at another location and are not offered employment at another location.

That construction rests on the fact that an otherwise eligible employee for LIB benefits is barred from eligibility if he is "entitled" to early retirement under the Pension Plan. The Pension Plan says that the employee laid off under the above conditions "may apply" for retirement within 60 days of the Location Closedown layoff, *provided* a lump sum payment related to length of service *has not been made* solely because of the Employee being laid off.

Option (a), which is the Lump Sum provision of the LIB plan, also requires exercise within 60 days of a layoff expected to last more than 6 months.

Thus, as the court sees it, an employee under the above conditions could do one of three things (1) he could elect Option (a) under the LIB plan for a lump sum, but in doing so he would sever his relationship and surrender his recall and seniority rights. He would no longer be an employee in active service and, although he might have vested pension rights he could no longer select early retirement; (2) he could elect to take early retirement instead of the lump sum, in which case he would become "entitled" to early retirement and so could not be eligible for LIB benefits; (3) he could exercise Option (b) and draw supplemental unemployment benefits from the LIB plan for up to 12 months, but could not receive any balance under Option (c) be-

cause he would have been laid off within 1 year of the date he became "eligible" for early retirement. Unless reemployed by the company in accordance with his recall rights and seniority, he would not be able to draw early retirement payments because he would no longer be in active service.

The employer's construction is based on the proposition that the conditions for eligibility for LIB benefits should be read as though coverage under the LIB plan were barred if the employee were "eligible" for early retirement under the pension plan rather than "entitled" (as the provision reads).

From the standpoint of the EEOC charge under ADEA, it makes no difference which construction is correct. If the court's construction is correct, there is no ADEA violation because the choice of a lump sum payment under LIB or of early retirement pension payments was a choice of the employee and so cannot be an unlawful act of the employer under 29 U.S.C. § 623(a), in and of itself. If the employer's construction is correct, then there is no ADEA violation because the employer's action was based on reasonable factors other than age, 28 U.S.C. § 623(f)(1), or was in observance of the terms of a bona fide seniority system and two bona fide employee benefit plans (one welfare and the other pension), none of which can be a subterfuge to evade the purpose of the Act, 29 U.S.C. § 623(f)(2).

In its earlier brief memo ruling, which EEOC asked to have reconsidered, the court suggested that if the company had mistakenly construed the various provisions, the error could be cured by an exchange of benefits with suitable interest adjustments, for those employees not aware that they had a choice, if they had one. This would be a classic instance of mutual mistake.

While the element of mutual mistake is still a potential circumstance, the comments made then as to a method for adjusting benefits were probably not correct. If the court's construction is correct in the sense of supporting the conclusion that no ADEA violation could exist under that assumption, the court now considers it prudent to refrain from any comment on modes for adjusting the assumed error, since it cannot undertake the task on the EEOC complaint and the outcome may well vary from one to another employee. There are simply too many variables involved to warrant any general formula for adjustment. If called for, they would be in a proceeding other than this one, and may well call for individual analysis.

For instance, in reviewing the tabulated information supplied by the employer to EEOC in response to Interrogatory 2 of the second set of interrogatories, a number of specific variations appear. A few of these are noted.

... one employee aged 56 received LIB benefits of $12.16 and was not put on early retirement. He had been hired 1/11/68 and so was within one year of eligibility for early retirement on 4/1/77, but since he had less than 10 years' credited service, did not have the option for early retirement. He obviously did not choose Option (A) for a lump sum benefit. He applied for employment at the Bloomfield location and was rehired there [L. Dennis, p. 2, line 7];

... an employee aged 54 received neither LIB nor early retirement. He had been hired 2/8/76 and had less than two years' credited service [A. Celico, p. 1, line 19];

... an employee aged 47, hired 8/7/50, obviously chose Option (A) of the LIB plan and was paid $5,985.20 [M.F. Chuckran, p. 1, line 20]; but

... another employee aged 46, hired 2/9/51, evidently chose Option (B) of LIB, was paid $332.16 until rehired at Bloomfield where he evidently had contractual employment rights [R.B. Climes, p. 1, line 21];

... An employee aged 58, hired 4/19/71, evidently chose Option (A) of LIB and was paid $1,328. Presumably he could not have taken early retirement as he

had less than 10 years credited service [H.H. Piersall, p. 4, line 19];

... Another employee, aged 58, hired 8/30/68 and so had less than 10 years' credited service, was paid what seems to be a lump sum of $1,676.24 under LIB [A. Symonies, p. 8, line 5];

... An employee age 59, hired 9/26/68 and so had less than 10 years' service, was transferred to the Fairmont Plant and received neither LIB nor early retirement [J. Hanek, p. 8, line 9];

... An employee aged 63, hired 2/15/72 (when he was about 58) had less than 10 years' service, could not take early retirement and was paid $1,031.72 of LIB benefits [C. Roche, p. 8, line 12].

From a review of the tabulations in light of the contract provisions for LIB or for pension, coupled with seniority rights which would affect the existence of contractual employment rights at other locations, or with rehirings, it is plain that no ADEA violation could have been involved.

### 6. *The 1978 Amendment to ADEA.*

In 1978 the Congress amended 29 U.S.C. § 623(f)(2) by adding, at the end, the qualification that:

"no such seniority system or employment benefit plan shall require or permit the involuntary retirement of any individual specified by [29 U.S.C. § 631(a)] because of the age of the individual."

EEOC has argued that this amendment was intended to reflect the original intent of Congress when ADEA was originally enacted in 1967.

The argument is irrelevant or ineffective for several reasons. In the first place, as noted at the start, the complaint nowhere charges a violation of ADEA grounded on involuntary retirement because of age. The undisputed facts are that the employer closed down a plant location, and everyone working there was laid off without regard to age. The tabulation shows employees in their 20's, 30's, 40's, 50's and 60's. The only claim made was that those who were 55 and over and who received early retirement did not also receive "severance pay",

which has turned out to be a misnomer for Option (a) of the LIB plan, and which, had they received it, would have barred early retirement payments.

In the second place, the Supreme Court was aware of the pending amendment when it decided *United Air Lines v. McMann,* supra. Justice Marshall in the dissent for himself and Justice Brennan, relies on it in part for his argument. See 434 U.S. at 218, 98 S.Ct. at 457, noting that the amendment had passed both Houses before the decision came down, and footnote 11, suggesting that the amendment was intended as a clarification to take effect immediately.

That view, however, was the view of only 2 members of the Supreme Court. The others were aware of the pending change, and reached their decision, binding here, without regard to it.

The events involved in this case took place as far back as January, 1977, some 11 months before the ruling was handed down, and must be controlled by that decision no matter what the prospective effect of the 1978 amendment.

### 7. *The Statute of Limitations Revisited.*

After full exploration of the ADEA significance of the court's construction versus the employer's construction and the claim of EEOC that the employees for whom it sues were entitled to have *both* Lump Sum LIB payments *and* early retirement payments (a claim it now recognizes to be wholly unsupported by any controlling document) it is plain that there has been no violation of ADEA.

This being so, there cannot have been any "willful" violation, and so the applicable statute of limitations is the two year statute rather than the three year statute, under the Portal-to-Portal Act.

Such few reported cases as there are on the difference between a "violation" of ADEA and a "willful violation" are of negligible aid to the trial courts. In this case, it happens that the filing of suit is too late under the three year statute, and that after

inspecting all the alternative theories it is obvious that there was no violation at all, much less a "willful" one, but only a misguided claim for double-dipping benefits which all the documents indicate are to be barred.

The details of seniority systems, welfare benefit plans, pension benefit plans, and the like, are highly complex. More often than not their terms are the result of hard collective bargaining. It is not unusual to find seeming contradictions in documents which are the encrustation of various changes negotiated over the years, usually not deleting old provisions lest someone lose an existing benefit, but rather adding new ones.

In enacting ADEA the Congress recognized that many arrangements of this kind have been long and well established, that the factor of age is inevitably involved in working out the economic aspects of such arrangements, and that this fact was not to be regarded as any kind of indication of an ADEA violation so long as the seniority system or benefit plan was bona fide, and not a subterfuge to evade the purposes of the Act.

Given this context it is difficult to see how the application of a system or plan of this kind can come within the scope of what the Act prohibits when all the evidence shows that the specific terms and conditions were negotiated at the collective bargaining table, and yet call a "technical" violation a "willful" one merely because the act was done. Whatever the word "willful" may mean in other contexts, its use in ADEA reflects some state of mind outside the scope of subject matter in which age is a reasonable and relevant factor.

The amount of pension benefits, or of LIB benefits, in this case for example, are tied primarily to the level of earnings and the years of service with the employer. Age is inevitably involved and cannot be excluded as a factor in making the arrangements. An employee with one year's service must be one year older than when first hired. The actuarial sum needed to pay some particular periodic amount will depend on how much was paid in over how many years, and when payments begin for a span to run for the rest of the employee's life, and for a surviving spouse or other successor beneficiary, age must enter into the equation because life ends in death and the statistical base is very large and very reliable. It must be taken into account.

To some extent, the impression here is that EEOC misconceived the foundation for the claim asserted, and when the error was discovered failed to understand that the error was fatal to the ADEA claim.

In any event, in circumstances where the time devoted to a careful study of the documentation and the history is as thorough as it has been in this case, the court sees no rational basis for claiming a "willful" violation if there were any violation at all, which the court is thoroughly satisfied there was not.

Submit order simply reciting that for the reasons here given, the EEOC motion for partial summary judgment is denied, and that the Westinghouse cross-motion for summary judgment is granted.