**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**v.**

**WESTINGHOUSE ELECTRIC CORPORATION, Appellant.**

**No. 86–1226.**

United States Court of Appeals, Third Circuit.

Argued Oct. 20, 1987.

Decided Feb. 2, 1989.

Dona S. Kahn, Harris & Kahn, Philadelphia, Pa., Thomas L. Morrissey, Carpenter, Bennett & Morrissey, Newark, N.J., James D. Crawford (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Andrew M. Kramer, Patricia A. Dunn, Jones, Day, Reavis & Pogue, Washington, D.C., for appellant.

Gale Barron Black, Irene L. Hill, Johnny J. Butler (argued), E.E.O.C., Appellate Services Div., Washington, D.C., Alfred Miller, Miller, Singer & Raives, P.C., New York City, for appellee.

## ORDER

### SUR PETITION FOR PANEL REHEARING

Before: HIGGINBOTHAM, SCIRICA and GARTH, Circuit Judges.

1. After consideration of the contentions raised in the petition for rehearing filed by Westinghouse Electric Corporation in the above-entitled case and the response thereto by the Equal Opportunity Employment Commission, and all judges who participated in the decision of this Court having asked for rehearing on the basis of the contentions raised in the petition for panel rehearing, the petition for rehearing is granted. Reargument is not granted in this matter. The panel is unanimously of the opinion that the facts and legal arguments are adequately presented in the briefs and record. Rules of the United States Court of Appeals for the Third Circuit, Court Rule 12(6)(a).

2. After rehearing, the opinion in the above-entitled matter filed on November 30, 1988 [1988 WL 148606] is vacated, and an amended opinion is hereby filed.

3. Judge Garth would also have granted Westinghouse's petition with regard the panel's decision to remand the issue of willfulness to the district court, rather than reversing the district court's willfulness de-

termination. In so voting, Judge Garth relies upon the analysis and reasons set forth in his separate opinion which dissented from the panel's disposition of the willfulness issue. In that opinion, Judge Garth urged that the only appropriate disposition of the willfulness issue was an outright reversal of the district court's willfulness finding.

Before HIGGINBOTHAM, SCIRICA and GARTH, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

This appeal arises from an action brought by the Equal Employment Opportunity Commission against Westinghouse Electric Corporation, based on the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 (1982). The EEOC alleges that Westinghouse's 1979 and 1982 pension and severance pay policies,[1] discriminate based on age. After a bench trial, the district court found that Westinghouse's plans discriminate based on age, and that Westinghouse willfully violated the ADEA. Westinghouse appeals from that decision.

In our review, we must determine whether Westinghouse's 1979 pension and severance pay plans, denying severance pay to retirement-eligible employees who are terminated or laid off, violate § 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1). We must also decide whether Westinghouse's 1982 pension and severance pay plans, which allow retirement-eligible, involuntarily terminated employees to elect either severance pay or retirement benefits, but not both, violate 29 U.S.C. § 623(a)(1). We hold that under both plans, retirement-eligible employees are treated less favorably than their younger counterparts with respect to their ability to receive severance pay. Because retirement eligibility under the Westinghouse plans is inseparably linked with age, the discriminatory treatment is based on age. Therefore, both the 1979 and 1982 plans violate the ADEA.[2]

We must also address Westinghouse's claim that its severance pay plans are exempt from ADEA coverage under § 4(f)(2), 29 U.S.C. § 623(f)(2). Because those plans are not part of an integrated employee benefit scheme that satisfies § 4(f)(2) and do not involve age-related cost factors, we reject Westinghouse's § 4(f)(2) defense.

Finally, we must decide whether the district court erred in concluding that Westinghouse willfully violated the ADEA. We will remand to the district court to reevaluate willfulness because: (1) some of the factors relied upon by the district court do not support its finding of willfulness, and (2) the court did not consider separately the 1979 plans and the 1982 plans when making its determination on willfulness.

## I. *Proceedings*

In November, 1982, Charles Slackway, age 62, a former employee at Westinghouse's Lester, Pennsylvania facility, filed a charge of age discrimination with the EEOC. Slackway claimed that unlike younger employees, he was denied severance pay when he was laid off. *See* J.App. at 1952. In June, 1983, the EEOC issued a letter of violation to Westinghouse, concluding that Westinghouse discriminated against Slackway (and others named and/or yet to be named) in violation of 29 U.S.C. § 623(a)(1). The letter stated that the Commission, in accordance with its

---

**1.** The term severance pay plan refers to the 1979 Layoff and Income Benefits Plan ("LIB") and the 1982 Employee Security & Protection Plan ("ES & P"), which cover non-management employees; and to the Management Separation Allowance Program ("MSA"), which covers management personnel.

Westinghouse revised its pension and LIB plans in 1982 ("1982 plans"), and its MSA plan in 1985, to provide employees with an option to receive either severance pay or retirement benefits.

**2.** Westinghouse contends that a *prima facie* case of age discrimination was not established. That issue, however, is "subsumed on appeal into whether the plaintiff has sustained ... [its] ultimate burden of proving that age was a determinative factor in the plaintiff's termination." *Dreyer v. Arco Chemical Co., Div. of Atl. Richfield,* 801 F.2d 651, 654 (3d Cir.1986). *See also Berndt v. Kaiser Aluminum & Chemical Sales, Inc.,* 789 F.2d 253, 257 (3d Cir.1986).

statutory mandate,[3] sought voluntary compliance with the ADEA through informal methods of conciliation. J.App. at 1971.[4]

Evidently, efforts at conciliation proved fruitless and the EEOC filed its original complaint on November 10, 1983, pursuant to 29 U.S.C. § 626(b). The EEOC alleged that Westinghouse willfully engaged in unlawful employment practices at its Lester, Pennsylvania facility, in violation of 29 U.S. C. § 623(a)(1), by failing to provide Layoff and Income Benefits (LIB) to employees age sixty or older who were terminated or laid off and were eligible for, and/or had received, early retirement benefits under Westinghouse's pension plan. The complaint identified thirty-five aggrieved employees and included all others similarly situated. J.App. at 15.

EEOC filed its first amended complaint on August 23, 1984, expanding the action to include Westinghouse's Concordville, Pennsylvania facility. That complaint identified 126 aggrieved employees, included others yet to be named, and contained allegations of additional unlawful employment practices: (1) denying LIB to employees laid off prior to July, 1982 who were eligible for any type of retirement benefit; (2) giving employees who were laid-off after July, 1982, the option of selecting either LIB or retirement, but not both; (3) forcing laid-off employees to retire prior to age seventy because LIB was not available; (4) denying early retirement to laid-off employees who chose LIB; (5) denying recall work to employees who were laid off and forced to retire; and (6) giving lower retirement benefits to laid-off employees who were not eligible for retirement because of their age

at the time of the layoff, but who later became qualified for retirement benefits.

In October, 1984, the EEOC filed a second amended complaint, expanding its prior claims by alleging that Westinghouse engaged in those unlawful employment practices in all of its facilities nationwide. The employment practices were alleged to have begun at least as early as 1980, and to have continued through the time of filing of each of the complaints. The EEOC also filed a new collateral complaint containing the same nationwide allegations. The district court ordered that the cases be consolidated and tried jointly.

Following trial, the district court issued its opinion,[5] in which it held: (1) that Westinghouse's 1979 employee pension, and severance pay plans, which denied severance pay to employees who take retirement, discriminated based on age, in violation of 29 U.S.C. § 623(a)(1); (2) that Westinghouse's 1982 employee pension and severance pay plans, which provide laid-off employees with an option between severance pay and pension benefits, discriminate based on age in violation of 29 U.S.C. § 623(a)(1); and (3) that Westinghouse willfully violated the ADEA.[6]

With respect to both plans, the district court found that because receipt of severance pay is conditioned on non-retirement status, laid-off workers are treated differently on the basis of age. The court stated that "[a]ge and retirement are, in fact, so closely linked that a criterion based on one is a criterion based on the other." 632 F.Supp. at 367. In evaluating Westinghouse's plans, the district court did not

---

**3.** *See* 29 U.S.C. § 626(b).

**4.** Before instituting this lawsuit, the EEOC issued four more letters of violation to Westinghouse, each time stating EEOC's continued interest in conciliation, but indicating that if Westinghouse continued to ignore its efforts, the case would be referred to the legal unit for possible litigation. J.App. at 1974–81.

**5.** *EEOC v. Westinghouse Elec. Corp.,* 632 F.Supp. 343 (E.D.Pa.1986).

**6.** The EEOC's charges implicated several other Westinghouse plans and practices: (1) Advanced Retirement Plan I & II; (2) an "impact

number" process by which special benefits are awarded to certain employees who are laid off because of product-line relocation, job movement or location shutdown; (3) limiting retirement benefits to employees who are actually eligible when laid off; and (4) limiting death-prior-to-retirement benefits to spouses of deceased employees who were actually eligible for retirement benefits at the time of death. *See* 632 F.Supp. at 351. The district court held that these plans and practices do not violate the ADEA because they were bona fide pension and seniority arrangements. *Id.* at 369–71. Those rulings are not challenged on appeal.

consider separately the 1979 and 1982 plans. However, the court found that the option provided by the 1982 plans does not give employees a practical choice, because selection of LIB instead of retirement requires forfeiture of insurance and medical benefits. Therefore, the court concluded, for all practical purposes there is no difference between the 1982 plans and the 1979 plans. In any event, the court held that providing an option does not cure the violation because older employees still cannot receive both pension and severance pay. The option is merely a "sham to prolong the litigation of this issue." *Id.* at 366 n. 12.

The district court also rejected Westinghouse's assertion that its programs have a legitimate, non-discriminatory purpose. Westinghouse's justification was a purported corporate policy against double-dipping; that is, it would not provide more than one type of benefit to a laid-off employee in order to insure that all laid-off employees received some type of post-employment benefit. The court termed this argument inconsistent, noting that under the various severance pay plans, some employees can receive more than one type of post-employment benefit. For example, a laid-off employee age fifty-nine with more than ten, but less than thirty years of service, can receive LIB until age sixty, at which point he can take early retirement. *See* 1979 LIB plan at 4; 1982 ES & P plan at 7 (J.App. at 1806, 1817). Furthermore, the court held, the unstated premise of the no double-dipping rationale—that severance pay and pension benefits are fungible—is incorrect. Severance pay is a short-term fringe benefit that allows a laid-off employee to cope with the layoff and to seek new employment. Pension benefits, on the other hand, provide for long-term retirement. The two have distinctly different purposes:

"Pension benefits are not a substitute for severance pay." 632 F.Supp. at 367.

Next, the district court rejected Westinghouse's defense under § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2), which exempts from the ADEA's coverage bona fide employee benefit plans that are not a subterfuge to evade the purposes of the Act. The court found that severance pay is not a bona fide employee benefit plan because it is a fringe benefit and not an integral part of Westinghouse's pension plans. Alternatively, the court held that even if severance pay is part of a bona fide employee benefit plan, Westinghouse did not establish that its plan was not a subterfuge to evade the purposes of the ADEA, as required by 29 U.S.C. § 623(f)(2). Although Westinghouse's severance pay plan was in existence prior to the enactment of the ADEA, the court noted that since passage of the ADEA, Westinghouse's plans have undergone negotiation, adjustment and reaffirmation. It found that reaffirmation of prior discriminatory practices amounts to evasion of the ADEA and is a subterfuge to evade its purposes. 632 F.Supp. at 368.

Finally, the district court held that Westinghouse willfully violated the ADEA. The court said that Westinghouse: (1) stubbornly resisted compliance with the ADEA, (2) ignored judicial invalidations of policies similar to its own, (3) belatedly invented a corporate policy against double-dipping to justify its unwillingness to comply, and (4) made a "good faith" argument—that the 1979 plan was designed before enactment of the ADEA, and that the 1982 plan was designed in reliance on statements made by EEOC counsel in another litigation[7]—that was transparent and incredible.

In order to decide the issues presented in this case, we must examine Westinghouse's pension and severance pay plans.[8]

---

**7.** In 1980, the EEOC filed suit against Westinghouse in the District of New Jersey, alleging that Westinghouse violated 29 U.S.C. § 623(a) by failing to provide LIB to employees eligible for early retirement under the Westinghouse pension plan. *See EEOC v. Westinghouse Elec. Corp.,* 577 F.Supp. 1029 (D.N.J.1982), *rev'd,* 725 F.2d 211 (3d Cir.), *cert. denied,* 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984).

**8.** Only those Westinghouse post-employment policies that are implicated in this appeal are discussed. For a description of Westinghouse policies that were challenged at trial but not on appeal, *see* 632 F.Supp. at 354-56.

## II. *The plans*

### A. *1979 pension plan*

The 1979 version of Westinghouse's pension plan provided for "normal," "deferred," "early," or "selected" retirement. Normal retirement occurred at age sixty-five, after five years of service. However, an eligible employee could defer retirement until age seventy. Also, certain employees could take early retirement before age sixty-five (normal retirement age). Depending on the years of service, an employee could retire at specified ages between fifty and sixty. There were four "early retirement" subcategories, three of which concerned early retirement after layoff. Those three subcategories provided that a laid-off employee who had received lump-sum severance pay was ineligible for early retirement. *See* J.App. at 1598–99.

Selected retirement under the 1979 plan contained two subcategories. Under the first subcategory, an employee with at least thirty years of service could choose selected retirement when he was between fifty-eight and sixty-five years of age. The second subcategory concerned selected retirement after layoff. An employee laid off because of a location closedown, or a job movement or product-line relocation after August 1, 1979, was eligible for selected retirement if he was between fifty and sixty years of age, had at least thirty years of service, and did not receive lump-sum severance pay.

### B. *LIB: 1979 separation benefits plan for non-management personnel*

After layoff, certain non-management employees could receive separation benefits termed "Layoff and Income Benefits" ("LIB"). Eligibility for LIB was determined by two or more full years of service and, most important for our inquiry, by non-entitlement to early or selected retirement benefits under the Westinghouse pension plan.[9] *See* Article VI, § 1(a) of 1979 LIB plan (J.App. at 1302, 1805).

An eligible employee could receive LIB in one of several forms. If management thought that the layoff would exceed six months, the employee could receive the maximum allowable sum in a lump-sum payment. An employee who chose a lump-sum payment permanently severed his relationship with Westinghouse and relinquished any recall rights or credits for years of service with the company (with the exception of his rights, if any, under the pension plan). J.App. at 1303, 1304; J.App. at 1805, 1806. Alternatively, an eligible employee who wanted to retain recall rights and service credits (*see* J.App. at 1304; J.App. at 1806) could apply for weekly benefits in lieu of a lump-sum payment. Weekly payments, including any state or federal unemployment compensation benefits received by the employee, would be sixty percent of the employee's "week's pay." *See* J.App. at 1304; J.App. at 1806.

The third manner of payment of LIB occurred when an eligible employee had been on layoff for one year and Westinghouse had not offered him reemployment. In that situation, the balance of the maximum sum would be paid to the employee in a lump sum, provided he was not laid off within one year of the time he would have become eligible for early retirement under the pension plan. In the latter instance, the employee would receive weekly payments until age sixty, when he would receive his early retirement pension. Payments made under the third option did not affect recall rights or service credit. J.App. at 1304; J.App. at 1806.

### C. *Pre–1985 separation benefits for management personnel*

Separation benefits for management personnel paralleled the structure of LIB. These benefits are provided for in the Westinghouse "Management Separation Allowance Plan" ("MSA"), which became effective February, 1975. *See* J.App. at 1850–72. The purpose of MSA, like LIB, was to provide financial assistance to laid-

---

**9.** Employees who are eligible for early or selected retirement are referred to as "retirement-eligible employees."

off employees during the period immediately following layoff. The MSA plan provided monetary benefits calculated on the basis of the years of credited service, the basic monthly salary at time of separation, and the reason for separation of the employee. Management employees who at the time of separation (or upon attaining age sixty) were eligible for either early or selected retirement were not eligible for MSA benefits. J.App. at 1858, 1862.

MSA benefits could be received on a monthly basis, or in a lump-sum payment. Lump-sum payments, however, had to be specifically requested by the employee, and would be made in the discretion of management. J.App. at 1864. If the employee was granted lump-sum payment, then life insurance, hospitalization, surgical, maternity, and major medical protection terminated on the last day worked.[10]

### D. *The 1982 pension plan*

In July, 1982, Westinghouse revised its pension plan. The revised plan retained four categories of retirement: "normal," "deferred," "early," and "selected." Normal retirement, as under the 1979 plan, is at age sixty-five. An employee could defer retirement for any length of time until age seventy. *See* §§ 2.A. & 2.B, 1982 pension plan (J.App. at 1549).

Early retirement remained possible under any of the four subcategories that existed under the 1979 pension plan. Depending on the employee's years of service, he could retire at specified ages between fifty and sixty. A condition of early retirement under each subcategory was that the employee not have elected to receive benefits under the Westinghouse separation benefits plan.[11] *See* § 2.C., 1982 pension plan (J.App. at 1549–50).

Selected retirement remained possible for an employee between fifty and sixty-five years of age, depending on years of service to the company. However, the employee must not have elected benefits under the company's separation benefits plan. *See id.* at § 2.D. (J.App. at 1550).

### E. *ES & P plan—the 1982 separation benefits plan for non-management employees*

In 1982, Westinghouse also revised its separation benefits plan for non-management employees and renamed it the "Employee Security and Protection Plan" ("ES & P"). *See* J.App. at 1813. With some minor changes, the plan's structure is essentially the same as the 1979 LIB plan. An employee with at least two years of service who is laid off as the result of a location closedown is eligible to receive a lump-sum payment determined by his salary and length of service. *See* 1982 ES & P plan at 2 (J.App. at 1815). If the employee is laid off due to job movement or product-line relocation, he may receive a lump-sum payment if he has at least fifteen years of service. No matter what the reason for the layoff, the employee may choose to receive weekly payments instead of a lump-sum payment. *See id.* at 2, 4–6 (J.App. at 1815, 1816–17).

Unlike the 1979 LIB plan, the ES & P plan does not preclude retirement-eligible employees from receiving separation benefits; it gives them an option. If a retirement-eligible employee is laid off because of location closedown, job movement or product-line relocation, he may elect either early retirement, or lump-sum payment of separation benefits. Employees who elect to retire are eligible to receive several pension and insurance benefits not available to those who select ES & P benefits: a pension payable for life; a supplemental monthly payment for each year of credited service until eligible for Social Security payments; an opportunity to provide continued benefits to a spouse or other person in the event of death; continuation of life insurance; continuation of medical coverage until eligible for Medicare; and contin-

---

**10.** If the employee chose to receive monthly payments, these other benefits would continue for the duration of the monthly payments, or for a period of twelve months, whichever was shorter.

**11.** The LIB plan was revised in July, 1982 and was renamed the "Employee Security and Protection Plan" ("ES & P").

uation of dependent insurance. *See id.* at 3 (J.App. at 1815–16).

### F. *Post–1985 MSA*

For purposes of this appeal, the only relevant change in the MSA plan occurred in September, 1985: a retirement-eligible management employee who is laid off may now choose either MSA or pension benefits. *See* J.App. at 742–43, 751 (T. Sept. 6 at 121–22, 140). Prior to that date, laid-off management employees were ineligible for MSA benefits if they were eligible for either early or selected retirement benefits. *See supra,* description of MSA plan, effective February, 1975.

### III. *Discussion*

■ At the outset, we must determine whether the district court abused its discretion under Fed.R.Civ.P. 15 by permitting the EEOC to twice amend its original complaint. *See Lewis v. Curtis,* 671 F.2d 779, 783 (3d Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 144 (1982); *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing, Inc.,* 663 F.2d 419, 425 (3d Cir.), *cert. denied,* 455 U.S. 1018, 102 S.Ct. 1714, 72 L.Ed.2d 136 (1982) (grant of leave to amend will be reversed only for abuse of discretion). Those amendments expanded the action to include employment practices at Westinghouse's facilities nationwide, and to increase the list of aggrieved employees on whose behalf relief was sought. Westinghouse contends that it did not have fair notice of the additional claims or the expansion of the action. Furthermore, Westinghouse argues that it was substantially prejudiced because the amendments rendered its initial discovery efforts inadequate, disrupted its litigation strategy, and caused a loss of opportunity to investigate and mitigate its liabilities.

We hold that the district court properly allowed the amendments. Claims asserted in amended pleadings relate back to the date of the original pleading if they "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading...." Fed.R.Civ.P. 15(c). The additional claims presented in the first amended complaint, like those in the original complaint, concern Westinghouse's denial of severance pay to retirement-eligible persons. The second amended complaint raised no additional substantive claims; it merely expanded the action to include employment practices in Westinghouse's facilities nationwide. The factual basis for the amended claims was identical.

Because the employment practices complained of in the original and first amended complaints were in effect at all of Westinghouse's facilities nationwide, Westinghouse was not deprived of fair notice. *See Coventry v. United States Steel Corp.,* 856 F.2d 514, 519 (3d Cir.1988). *See also* 6 C. Wright & A. Miller, *Federal Practice and Procedure* § 1501 at 526–27 (1971 & Supp. 1987) (When the original complaint notifies defendant of conduct upon which plaintiff bases his claim, it is "reasonable to assume that defendant has knowledge of any claim plaintiff might assert ... arising out of the event in dispute."). Furthermore, increasing the list of aggrieved employees did not prejudice Westinghouse because it had notice that any employee adversely affected by its severance pay policies was a potential plaintiff. *See* C. Wright & A. Miller, § 1501 at 524.

Under these circumstances, the diminution of Westinghouse's initial discovery efforts does not constitute undue prejudice that would preclude amendment. *Cf. Cornell & Co. v. Occupational Safety & Health Review Comm'n,* 573 F.2d 820, 825 (3d Cir.1978) (amendment of complaint to allege safety-belt violation when original complaint alleged improper flooring on construction structure changed legal and factual matters in dispute, resulting in undue prejudice to non-moving party). Similarly, the fact that Westinghouse may have had to alter its litigation strategy as a result of the amendments is not dispositive. *See* 6 C. Wright & A. Miller § 1497, at 499–592.

### *Standard of Review*

Our review of the district court's choice, interpretation or application of legal precepts is plenary. *In re McKeesport Steel*

*Castings Co.*, 799 F.2d 91, 93 (3d Cir.1986) (quoting *Universal Minerals v. C.A. Hughes & Co.*, 669 F.2d 98, 101–02 (3d Cir.1981)); *Killeen v. Travelers Ins. Co.*, 721 F.2d 87, 89 (3d Cir.1983). We apply this standard to whether Westinghouse's post-employment benefits plans violate the ADEA, and if so, whether under 29 U.S.C. § 623(f)(2) they are exempt from coverage. We review under the clearly erroneous standard factual findings that underlie the district court's conclusions. Fed.R.Civ.P. 52(a); *see also Pullman–Standard v. Swint*, 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66 (1982). Similarly, we apply the clearly erroneous standard to the facts relied upon by the district court in finding willfulness.

A. *Westinghouse's 1979 post-employment policies*

Westinghouse maintains that its 1979 post-employment policies did not violate the ADEA because they did not treat employees in the protected age group [12] less favorably than non-protected employees. Indeed, Westinghouse contends that it treated older employees more favorably than younger employees because the value of early retirement benefits (eligibility for which precluded receipt of LIB or MSA benefits) was greater than or at least equal to the value of LIB or MSA benefits plus a deferred pension.[13] In addition, Westinghouse argues that even if less-favorable treatment occurred, it was not based on age. It contends that pension eligibility, on which the denial of LIB and MSA to older employees was based, is a reasonable factor other than age and therefore its policies did not violate the ADEA. Fur-

ther, Westinghouse argues that the pension, LIB and MSA plans formed a comprehensive and integrated benefits program under which no employee receives more than one type of post-employment benefit, and therefore were lawful means of ensuring that the greatest possible number of employees received at least some type of post-employment benefit.

■ We hold that the district court's finding that Westinghouse's denial of severance pay to employees who retire was based on age, is not clearly erroneous. Under Westinghouse's 1979 plans, older employees were treated less favorably than younger employees. Even if we accept Westinghouse's contention that the value of early retirement benefits is actuarially greater than or equal to the value of LIB or MSA plus a deferred pension, our conclusion is the same. The 1979 pension and severance pay plans denied severance pay to laid-off employees who were eligible for early or selected retirement.[14] Those employees, however, had vested rights to their retirement benefits independent of Westinghouse's policy on severance pay. It is therefore inappropriate to characterize retirement benefits as a more valuable substitute for severance pay. Any right to severance pay was in addition to, not a part of, the preexisting vested right to retirement benefits. Further, younger employees not in the protected age group, having the same length of service and being laid off for the same reason as older employees, were able to receive both severance pay and retirement benefits (when they reached the required age).[15] Therefore, older em-

---

**12.** The ADEA protects individuals between forty and seventy years of age. *See* 29 U.S.C. § 631(a). For clarity, we refer to those individuals as "older" employees. Employees not covered by the ADEA are referred to as "younger" employees.

**13.** Westinghouse bases its argument that the value of pension benefits is greater than or equal to the value of LIB or MSA plus a deferred pension on the trial testimony of, and oral report by, Westinghouse's actuarial specialist. *See* J.App. at 999–1012; J.App. at 2088–92.

**14.** Under the 1979 pension plans, employees who received lump-sum LIB or MSA payments

were precluded from early or selected retirement. Apparently, those who received weekly LIB or monthly MSA were not. This distinction is irrelevant, though, because the LIB and MSA plans did not allow retirement eligibles to receive either weekly or lump-sum severance pay.

**15.** Under Westinghouse's plans, some older employees could have received both deferred retirement benefits and severance pay—for example, an employee who was laid off between the ages of forty and fifty, or one over fifty who did not have the requisite years of service. That fact is irrelevant. The ADEA protects individual rather than group rights: it is unlawful for an

ployees were treated less favorably than younger employees despite the fact that the actuarial value of early retirement benefits may be equal to or greater than the actuarial value of LIB or MSA.[16] *See EEOC v. Borden's, Inc.*, 724 F.2d 1390, 1393–94 (9th Cir.1984).

■ Our inquiry does not end here, however. To establish a violation of the ADEA, the EEOC must demonstrate not only that older employees were treated less favorably than younger employees, but also that the less favorable treatment was based on age. 29 U.S.C. § 623(a)(1); *see also Smithers v. Bailar*, 629 F.2d 892, 897–98 (3d Cir.1980) (plaintiff must show that age made a difference in the complained of decision). It is a defense to a charge of age discrimination under the ADEA that the differentiation complained of is based on reasonable factors other than age. *See* 29 U.S.C. § 623(f)(1).

Westinghouse contends that its denial of LIB or MSA benefits to employees eligible for early or selected retirement was not based on age, but on retirement eligibility. It argues that eligibility for retirement (and ineligibility for LIB or MSA) under its plans depended upon several factors, only one of which was age. Appellant's brief at

26. Those other factors are seniority, the date of involuntary termination and the reason for the termination. However, an example demonstrates that age was the determinative factor.[17] Consider two employees, each having ten years of service with the company, both terminated on the same date, and for the same reason (*e.g.* location closedown). One employee is age fifty-five at the time of layoff, and the other is thirty-nine. The fifty-five-year-old employee would be eligible for early retirement under the third subcategory of early retirement and therefore would be ineligible for LIB or MSA benefits. *See* 1979 pension plan, § 2.C.3. The thirty-nine-year-old employee, however, would be eligible for LIB or MSA even though his years of service, termination date, and reason for termination are exactly the same as those of the fifty-five-year-old employee. Age, then, is clearly the basis for the denial of severance pay to the older employee. Under Westinghouse's 1979 plans, therefore, retirement eligibility was not a "reasonable factor other than age" because it is inexorably linked with age.

This conclusion corresponds with our decision in *EEOC v. Westinghouse Elec. Corp.*, 725 F.2d 211 (3d Cir.), *cert. denied*, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38

employer to "discriminate against any *individual* ... because of such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). *See also Connecticut v. Teal*, 457 U.S. 440, 453–55, 102 S.Ct. 2525, 2533–35, 73 L.Ed.2d 130 (1982) (recognizing that under a similar provision in Title VII, "an employer ... [cannot] discriminate against some employees ... merely because he favorably treats other members of the employees' group." *Id.* at 455, 102 S.Ct. at 2535). Therefore a violation can occur despite the fact that some members of the group were treated as favorably as non-protected employees.

16. Even if it were somehow relevant whether the value of early retirement benefits exceeds the value of LIB or MSA plus a deferred pension, Westinghouse's expert's conclusions are not probative in this case. Those conclusions were based on an examination of the value of early retirement benefits to employees as a class and not on an individual basis. J.App. at 1001; J.App. at 2089.

As discussed *supra* note 15, however, the ADEA protects individual rights. Westinghouse's expert stated that actuarial mathematics is based

on the law of averages and does not predict effects upon one individual. He therefore conceded that in some circumstances an individual who receives LIB and a subsequently vested pension might actually receive more valuable benefits than a retired employee who did not receive LIB benefits. J.App. at 1001. Thus, Westinghouse's contention that the value of early retirement benefits is greater than the value of LIB or MSA plus a deferred pension does not preclude an ADEA violation: individual employees within the protected age group may receive a less valuable benefit than severance pay plus a deferred pension.

17. Although under Westinghouse's plans age was the determinative factor, we recognize that under the ADEA it is not necessary that age be *the* determinative factor. It is sufficient that age is *a* determinative factor in the complained of decision. *See Bhaya v. Westinghouse Elec. Corp.*, 832 F.2d 258, 259–60 (3d Cir.1987); *Duffy v. Wheeling Pittsburgh Steel Corp.*, 738 F.2d 1393, 1395 (3d Cir.), *cert. denied*, 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984); *Smithers*, 629 F.2d at 896–98. *See also Borden's*, 724 F.2d at 1393.

(1984) ("*Westinghouse I*"), in which we rejected Westinghouse's contention that the 1976 version of its pension and LIB plans, which denied severance pay to laid-off employees who were eligible for early retirement, was based on reasonable factors other than age. We found that eligibility for early retirement is so closely related to age that recognizing it as a justification for the denial of LIB to employees within the protected age group would defeat the purposes of the ADEA. *See id.* at 222–23. *See also EEOC v. City of Altoona,* 723 F.2d 4, 6 (3d Cir.), *cert. denied,* 467 U.S. 1204, 104 S.Ct. 2386, 81 L.Ed.2d 344 (1983); *Borden's,* 724 F.2d at 1394.

■ Next, Westinghouse argues that severance pay was not denied on the basis of age, but on receipt of an alternate form of post-employment income. According to the company, its LIB and MSA plans are part of an integrated benefits program designed to provide a single, immediate post-employment benefit to the greatest possible number of employees.

The district court concluded that Westinghouse's 1979 LIB and MSA plans were not part of an integrated program designed to effectuate a no-double-dipping policy. 632 F.Supp. at 366–67. The district court, citing specific examples from Westinghouse's plans, rejected Westinghouse's no-double-dipping rationale as inconsistent with the content of the pension and severance pay plans. Under those plans, severance pay and pension benefits have distinctly different purposes. Severance pay was a short-term fringe benefit to provide financial assistance during the adjustment period immediately following layoff; pension benefits were long-term retirement benefits. The district court concluded that pension benefits are not a substitute for severance pay. We agree.

The fact that Westinghouse's pension plan was referenced in the LIB and MSA plans (eligibility for the latter dependent upon ineligibility for early or selected retirement under the former) is insufficient to characterize them as integrated:

> [T]he mere fact that the benefits available to employees under the Pension Plan were to be considered when determining eligibility for LIB ... does not merge the two plans into a 'coordinated benefit plan.' On the contrary, this interaction shows that the LIB Plan is not an integral part of the Pension Plan.

*Westinghouse I,* 725 F.2d at 225 (citation omitted). The LIB and MSA plans, under which eligibility for benefits was based on an employee's length of service and the occurrence of a layoff, are more analogous to a fringe benefit than part of an integrated employee benefit plan. *See id.* at 224–25; *see also Borden's,* 724 F.2d at 1396–97 (severance pay policy similar to Westinghouse's LIB and MSA plans is a fringe benefit, not an integral part of retirement and pension package). LIB and MSA were fringe benefits provided transitionally to ease the shock of layoff. Vested pension benefits, as discussed *supra,* could not be a substitute for LIB and MSA. Therefore, the district court did not err by concluding that Westinghouse's 1979 LIB and MSA plans were not part of an integrated program designed to effectuate a no-double-dipping policy.

**B. *Westinghouse's 1982 policies***

As described, *supra,* Westinghouse revised its LIB plan in 1982 (ES & P plan), and its MSA plan in 1985, to provide retirement-eligible employees who are laid off the option of selecting either early retirement benefits or severance pay. Westinghouse contends that these option plans do not violate the ADEA for the same reasons that the 1979 LIB and MSA plans did not: older employees with more service time who retire receive greater income benefits than their younger counterparts who are laid off and receive ES & P or MSA benefits. In our discussion of the 1979 plans, we have already rejected the argument that greater actuarial value cured the age discrimination inherent in the plans.

■ Westinghouse also argues that even if the 1979 plans violate the ADEA, the option plans, embodied in the 1982 ES & P plan and 1982 Pension plan, are valid because they provide an "additional benefit" to retirement-eligible employees: they can

choose the post-employment benefit they most prefer—severance pay or early retirement benefits. The district court concluded that because choosing severance pay under the 1982 plan meant relinquishing valuable pension and insurance benefits, retirement-eligible employees have no real choice but to retire and forego severance pay. The district court concluded that affected employees would be obliged to give up the pension and insurance benefits that accompany early retirement. 632 F.Supp. at 366 n. 12. Because the court concluded that there was no real option, it saw no difference between the 1979 and 1982 plans, and therefore it considered them as one plan.

Westinghouse contends that the 1982 plans give employees a practical choice: if they value severance pay more highly than early retirement benefits, they can choose the former. Westinghouse argues that despite the greater economic value of retirement benefits compared to severance pay, other factors might make severance pay more attractive to a retirement-eligible employee.

The "additional benefit" provided by the option plans, however, does not eradicate those aspects of Westinghouse's 1979 plans that violate the ADEA. Assuming *arguendo* that retirement-eligible employees do have a real choice, whatever choice those employees make, they are treated less favorably than their younger counterparts on the basis of age. A younger laid-off employee who is ineligible for early retirement and receives severance pay does not forfeit already vested retirement benefits. On the other hand, an older employee who is eligible for early retirement forfeits already vested benefits by choosing severance pay. As discussed with regard to the 1979 plan, once an employee reaches the requisite age

and years of service for early retirement eligibility, the benefits that accrue to early retirement become vested. By choosing severance pay, pursuant to the 1982 ES & P plan, that older employee automatically forgoes the benefits accompanying early retirement. ES & P plan, § 2(c), J.App. at 1274. The deprivation occurs at the time the older employee chooses severance pay.

The fact that an older employee may receive early retirement benefits at a later date, if recalled when still eligible for early retirement, does not cure the harm inflicted during the period that the older employee was deprived of vested benefits—benefits to which he was otherwise entitled.[18] Furthermore, there is no guarantee that the employee will be recalled, and therefore he may be forever deprived of his vested early retirement benefits. In that scenario, the older employee has forfeited valuable pension and insurance benefits that accompany early retirement: a supplemental monthly payment for each year of credited service until eligible for Social Security payments; an opportunity to provide continued benefits to a spouse or other person in the event of death; continuation of life insurance; continuation of medical coverage until eligible for Medicare; and continuation of dependent insurance. J.App. at 1815–16. He would be eligible to receive only a "Vested Pension" at age sixty-five (normal retirement age), 1982 Pension Plan, § 2.C.1., J.App. at 1549, which, unlike early retirement, is not accompanied by continued medical, life and dependent insurance, or supplemental pension benefits. 1982 Pension Plan, §§ 12, 19 & 10, J.App. at 1559, 1563, 1557). Similarly, an employee eligible for selected retirement who chooses severance pay over selected retirement benefits forfeits his selected retirement benefits, and qualifies only for a "Vested

---

**18.** It is not clear that upon recall the older employee, like the younger employee, retains the option to elect early retirement. Westinghouse contends that if both retirement-eligible employees and nonretirement-eligible employees were recalled, they could both receive early retirement benefits, with the attendant supplements and insurance benefits, if eligible at a later time. The 1982 Pension Plan, however, provides that "An employee who is laid off and would otherwise qualify for Early Retirement ... but who elected to receive benefits under the [ES & P plan] ..., shall not qualify for the Early Retirement Pension ... but shall instead qualify only for a Vested Pension....." 1982 Pension Plan § 2.C.1, J.App. at 1549. Of course, if the older employee loses his early retirement benefits even after recall, this compounds the discriminatory treatment.

Pension." 1982 Pension Plan, § 2.D.1, J.App. at 1550.

As with the 1979 LIB and MSA plans, the less favorable treatment afforded older employees by the 1982 ES & P and MSA plans is based on age. Therefore, the district court's finding of age-based discrimination was not clearly erroneous. Retirement eligibility is so closely linked with age that to hold otherwise would be to eviscerate the protection afforded older employees by the ADEA. We therefore hold that Westinghouse's 1982 pension and severance pay plans violate 29 U.S.C. § 623(a)(1).

We note that the cases cited by Westinghouse as support for its position that the option plans do not violate the ADEA are inapposite. In *Britt v. E.I. DuPont de Nemours & Co., Inc.*, 768 F.2d 593 (4th Cir.1985), the court held that DuPont's Voluntary Reduction of Force (VROF) program did not violate the ADEA. Unlike Westinghouse's program, the VROF program was entirely voluntary. Pension-eligible employees, instead of retiring or continuing to work, could choose severance pay, but only if they deferred certain pension benefits they otherwise would receive upon leaving DuPont. The court concluded that the plan did not violate the ADEA because unlike the severance pay policy in *Westinghouse I*, or *Borden's*, severance pay under the VROF program was not a fringe benefit, but a substitute for the right to continue working. *Id.* at 594. Taking severance pay "amounted in effect to additional wage earning necessitating the deferral of pension benefits in exactly the same way that continuing to work would necessitate deferral." *Id.* at 595. Indeed, that court distinguished both *Westinghouse I* and *Borden's*, which involved severance pay as a fringe benefit. *Id.* at 594–95. As we have stated, severance pay under the Westinghouse plans is a fringe benefit, not a substitute for pre-existing retirement rights.

In *Parker v. Federal Nat'l Mortgage Ass'n*, 741 F.2d 975 (7th Cir.1984), the employee claimed that his former employer, Federal National Mortgage Association, unlawfully discriminated against him by denying him severance pay because of his retired status. The court, in conclusory terms without analysis (other than distinguishing the case from *Borden's*, which did not involve an option-type severance pay policy), rejected the claim because it was Parker's decision to retire rather than to be laid off. *Id.* at 981. To the extent that the court held that an option policy like Westinghouse's does not violate the ADEA, we decline to follow it. Furthermore, the court found that Parker was unable to show that he could prove age-based discrimination if the case went to trial. *Id.* It appeared that the decision to terminate Parker was based on legitimate business factors (reasonable factors other than age) such as a contraction in the mortgage industry, and the employer's implementation of a centralization plan.

## C. *The § 4(f)(2) defense (29 U.S.C. § 623(f)(2))*

Westinghouse contends that denying severance pay, or providing an option, to retirement-eligible employees who are laid off was part of a bona fide employee benefit plan and therefore, even if otherwise in violation of the ADEA, its plans are exempt from the Act's coverage under § 4(f)(2), 29 U.S.C. § 623(f)(2). Westinghouse also argues that the district court's reliance on our decision in *Westinghouse I* in rejecting the § 4(f)(2) defense was erroneous because we decided that case based on a limited summary judgment record that did not contain the information necessary to demonstrate that Westinghouse's severance pay plans were integrated with its pension plans. That information, according to Westinghouse, was: (1) that the pension and severance pay plans were negotiated contemporaneously for twenty-five years; (2) that pension-eligibility requirements were continually liberalized to allow employees who were previously eligible to receive only LIB, to receive the more valuable pension and insurance benefits; (3) that LIB benefits were increased contemporaneously with increases in value of pension and insurance benefits; and (4) that its

plans were designed to effectuate a no-double-dipping policy.[19]

■■■ We hold that Westinghouse's LIB, MSA (both pre– and post–1985) and ES & P plans are not exempt under 29 U.S.C. § 623(f)(2). A plan can be exempt under § 4(f)(2) either as an employee benefit plan that itself satisfies § 4(f)(2), or as an integral component of an employee benefit plan that satisfies § 4(f)(2). *See Alford v. City of Lubbock,* 664 F.2d 1263, 1271–72 (5th Cir.), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 848 (1982). We have already rejected Westinghouse's argument, both in this opinion and in *Westinghouse I,* that its severance pay policies are part of an integrated benefits scheme designed to provide post-employment benefits to the greatest possible number of employees. Under the Westinghouse plans, severance pay is a fringe benefit for which vested early or selected retirement benefits cannot be a substitute.

We do not find dispositive the fact that the severance pay and pension plans have been negotiated contemporaneously, or that benefits under both were increased contemporaneously. The nature of the plan, rather than the manner in which it was negotiated or formulated, is the determinative factor. As we have stated, severance pay and pension benefits have different purposes under the Westinghouse plans. Although the two types of plans were negotiated together, the substance of the plans demonstrates that they are not integrated—*i.e.* the severance pay plans are not integral components of a comprehensive employee benefits scheme. For the same reason, liberalization of the pension-eligibility requirements to provide the option of pension benefits to employees who were previously able to receive only

severance pay does not demonstrate integration. Pension benefits are not a substitute for severance pay. Furthermore, we have already found that the severance pay is a fringe benefit and not part of a no-double-dipping policy. These additional factors cited by Westinghouse as being unavailable to this court when it decided *Westinghouse I,* then, do not alter our conclusion that the pension and severance pay plans are not integrated.

In order to qualify as exempt under § 4(f)(2), a plan must involve age-related cost factors: *i.e.* the cost of providing benefits pursuant to the plan must increase with age. *See EEOC v. City of Mount Lebanon,* 842 F.2d 1480, 1491 n. 9 (3d Cir.1988) (citing *Westinghouse I,* 725 F.2d at 224); *see also Borden's,* 724 F.2d at 1396. Westinghouse's severance pay plans do not meet this requirement. The amount of severance pay an employee receives under the Westinghouse plans is based on the employee's length of service with the company, the employee's salary at the time of the layoff, and the reason for the layoff.[20] These factors are not directly related to age, and the costs of supplying severance pay to employees therefore does not increase with age. *Westinghouse I,* 725 F.2d at 224–25 (no age-related cost factors in LIB plan providing severance pay benefits based on length of service and occurrence of a layoff). Consider, for example, two employees who began working at Westinghouse on the same date. One employee was age sixteen at that time, and the other was age thirty-seven. After five years of employment with the company, both are laid off because of location closedown. At the time of layoff, their salaries are identical. Both employees would receive the same amount of severance pay despite the fact that one employee is age twenty-one

---

**19.** Contrary to Westinghouse's contention, the record in *Westinghouse I* was sufficiently complete to allow a determination whether the version of Westinghouse's LIB plan complained of was an integral part of its pension plan. As is apparent from the opinion, the appendix contained the 1966 and 1976 pension plans, and the LIB plan, the structure of which was not materially different from the LIB and MSA plans complained of here. The district court's opinion also contains an extensive description of those

plans. 577 F.Supp. 1037–45. Furthermore, as discussed *infra,* even with the additional information in the record after trial, we reach the same conclusion.

**20.** *See* 1979 LIB plan, Art. IV, §§ 1, 2 (J.App. at 1302–03); 1975 MSA plan, Part III, § A (J.App. at 1858); 1982 ES & P plan at 2–7 (J.App. at 1815–17).

and the other is age forty-two. If the conditions allowing lump-sum payment are met, and the employees choose that form of payment, under the ES & P plan, each would receive severance pay equal to seven and one-half weeks salary. *See* 1982 ES & P plan at 2–4 (J.App. at 1815, 1816). Under the LIB plan, the result would be similar. Both employees would receive identical lump sum severance pay equal to five week's salary. *See* 1979 LIB plan at 2–3 (J.App. at 1805). If, on the other hand, the conditions for lump-sum severance pay were not met, or the employees chose not to elect lump-sum payment, under the ES & P plan both employees would receive a weekly benefit equal to sixty percent[21] of their weekly salary until the total maximum sum (seven and one-half weeks salary) has been paid, or until the end of twelve months from the date of layoff. *See* 1982 ES & P plan at 6 (J.App. at 1817). Under the LIB plan, the result is the same, except that the total maximum sum is five weeks salary. *See* 1979 LIB plan at 4 (J.App. at 1806).

Therefore, under Westinghouse's plans, the older employee receives no greater payments than a similarly situated younger employee. In addition, Westinghouse neither provides actuarial proof nor even alleges that it costs more to provide older employees with the same severance benefits as younger employees. *See Mount Lebanon*, 842 F.2d at 1493–94. The cost of supplying the benefits does not increase with age.

Indeed, other courts have recognized that a plan based on length of service and salary is not necessarily based on age. *See Karlen v. City Colleges of Chicago*, 837 F.2d 314, 319 (7th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 2038, 100 L.Ed.2d 622 (1988); *Betts v. Hamilton County Bd. of Mental Retardation and Developmental Disabilities*, 848 F.2d 692, 694 (6th Cir. 1988) (quoting *Karlen* ).

In sum, we conclude that Westinghouse's severance pay and pension plans are not exempt under 29 U.S.C. § 623(f)(2).

### D. *Willfulness*

Westinghouse contends that the district court erred by finding that the company willfully violated the ADEA, by applying a three-year statute of limitations and by awarding double damages. There had been no formal legal challenge to Westinghouse's severance pay plans at the time it negotiated the 1979 plans. Westinghouse argues that despite its belief that the 1979 pension and severance pay plans did not violate the ADEA, it changed those plans in 1982 to provide an option of either severance pay or retirement benefits to retirement-eligible employees. Westinghouse maintains that the change was in response to a statement by EEOC counsel (in other litigation) that an option would eradicate the aspects of the 1979 plans that allegedly violated the ADEA. That change, it contends, exemplifies its desire to comply with the Act, and therefore conclusively demonstrates its lack of willfulness.

The district court found that Westinghouse willfully violated the ADEA under the standard adopted in *Trans World Airlines v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). The *Thurston* standard permits liquidated damages under 29 U.S.C. § 626(b), when " 'the employer ... knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.' " *Id.* at 128, 105 S.Ct. at 625 (citation omitted). The Supreme Court did not decide in *Thurston* whether the same standard governs willfulness for the purpose of determining the appropriate limitations period under the ADEA.[22] *Id.* at 127–28, 105 S.Ct. at 624–

---

**21.** If the employee received unemployment compensation, the company would supplement those payments until the total was sixty percent of the employee's weekly salary. After unemployment compensation expired, the company would pay the full sixty percent until the employee's right to severance pay expired. *See*

1979 LIB plan at 4; 1982 ES & P plan at 6 (J.App. at 1817).

**22.** That issue was subsequently decided in the affirmative by the Supreme Court in *McLaughlin v. Richland Shoe Co.*, —— U.S. ——, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988).

25. There is a three-year limitations period for willful violations, and a two-year limitations period for non-willful violations. 29 U.S.C. § 626(e)(1) (incorporating 29 U.S.C. § 255(a)). The district court applied the *Thurston* standard of willfulness to the statute of limitations inquiry as well as to the liquidated damages issue. It found that Westinghouse acted willfully and awarded double damages to all injured employees who fell within the three-year statute of limitations.

Subsequent to the district court's decision in this case, we adopted the *Thurston* standard of willfulness to the determination of the appropriate limitations period under 29 U.S.C. § 255(a). *Brock v. Richland Shoe Co.*, 799 F.2d 80, 83 (3d Cir. 1986), *aff'd sub nom. McLaughlin v. Richland Shoe Co.*, —— U.S. ——, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). Although *Richland Shoe* involved a claim under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, the same standard of willfulness applies to the statute of limitations inquiry under the ADEA. *See* 29 U.S.C. § 626(e)(1). Therefore, the district court applied the correct standard of willfulness to the statute of limitations inquiry.

In concluding that Westinghouse recklessly disregarded the requirements of the ADEA, the district court essentially relied on four factors to support its finding of willfulness:

(1) Westinghouse "turned its face from 'the handwriting on the wall' by ignoring ... judicial invalidations of plans similar to" its own, in particular, *Borden's* and *Altoona;* (632 F.Supp. at 372)

(2) Westinghouse stubbornly resisted compliance with the ADEA by:

(a) failing to question or change its policies even after receiving letters of violation from the EEOC;

(b) maintaining its severance pay policies and insisting on their validity, even after commencement of litigation challenging those policies, and this court's ruling in *Westinghouse I;*

(c) taking that action despite having knowledgeable and experienced in-house counsel to ascertain the law and to advise them; and

(d) not violating the ADEA by mere mistake;

(3) Westinghouse belatedly invented a corporate policy against double-dipping to justify its unwillingness to comply with the ADEA; and

(4) the transparency of Westinghouse's good faith argument that (a) the 1979 plan was designed before the enactment of the ADEA and was in accordance with what appeared to be the law at the time, and (b) the 1982 plan was designed in reliance on statements made by EEOC counsel in the New Jersey litigation to the effect that an option plan would cure any discriminatory defects in Westinghouse's plans.

Of those factors, the strongest evidence of willfulness would be that an employer deliberately ignored judicial invalidations of plans similar to its own. Faced with court rulings that similar plans violated the ADEA, an employer's unwillingness to change its own plans is strong evidence of willful behavior. Whether judicial invalidations of other plans put Westinghouse on notice of the invalidity of its plans, depends in part on which plans were in existence at the time of those invalidations. In evaluating willfulness, however, the district court did not separately consider the 1979 and 1982 plans. In reviewing the district court's decision, we consider those plans separately. For reasons that follow, we conclude that the decisions in *Borden's* and *Altoona* do not support a finding of willfulness with respect to either the 1979 or the 1982 plans.

The severance pay policy invalidated by the Court of Appeals for the Ninth Circuit in *Borden's* provided that employees eligible for retirement (age 55 with 10 years of service) were not entitled to severance pay. 724 F.2d at 1391–92. The court held that retirement eligibility was not a reasonable factor other than age justifying the denial of severance pay, and concluded that the plan discriminated on the basis of age. Although the court in *Borden's* invalidated a plan similar to the Westinghouse 1979 LIB

and pre–1985 MSA[23] plans, by the time that case was decided, Westinghouse already had changed its LIB plan to one that allowed employees eligible for early retirement to choose either retirement benefits or severance pay. Because *Borden's* was not decided until after Westinghouse changed its LIB plan, it does not support a finding of willfulness with respect to Westinghouse's 1979 LIB plan. Furthermore, because *Borden's* did not confront an option plan like Westinghouse adopted in July, 1982, it does not support a finding that Westinghouse willfully violated the ADEA by maintaining its ES & P and option-type MSA plans.

Similarly, *Altoona* does not support a finding that Westinghouse willfully violated the ADEA with respect to either the 1979 plans, or the 1982 plans. In that case, we stated that pension eligibility is so closely linked with age that the differential treatment afforded pension-eligible employees was not a " 'differentiation [ ] based on reasonable factors other than age.' " 723 F.2d at 6 (citing 29 U.S.C. § 623(f)(1)). We held therefore that singling out pension-eligible persons for forced retirement violates the ADEA. That case, however, involved neither a flat denial of severance pay to pension-eligible employees, nor an option. It did provide notice to Westinghouse that pension eligibility is not a reasonable factor other than age, and that Westinghouse could not deny severance pay based on pension eligibility. However, by the time *Altoona* was decided, Westinghouse had already changed its LIB plan to provide an option (ES & P plan), and no longer flatly denied severance pay to pension eligibles. Therefore, *Altoona* does not support a

finding that Westinghouse willfully violated the ADEA with respect to its 1979 LIB and pension plans. Also, because we did not hold in *Altoona* that an option plan violated the ADEA, it does not support a finding that Westinghouse willfully violated the ADEA by maintaining the ES & P and MSA (as revised in 1985) plans.

Westinghouse, then, did not ignore the "handwriting on the wall." At the time *Borden's* and *Altoona* were decided, Westinghouse no longer maintained severance pay plans (except the pre–1985 MSA plan) like the ones invalidated those cases. Furthermore, because those cases did not involve option plans, they did not put Westinghouse on notice that its ES & P and 1985 MSA plans violated the ADEA. Therefore, the decisions in *Borden's* and *Altoona* do not support a finding of willfulness concerning either the 1979 or 1982 pension and severance pay plans.[24]

■ The district court also found that Westinghouse stubbornly resisted compliance with the ADEA. However, the record indicates that Westinghouse did consider whether its policies violated the ADEA,[25] see J.App. at 891–92; 902, 905; 1973, but refused to change its policies. While stubborn non-compliance in the face of contrary judicial authority might well constitute willfulness, good-faith adherence to, and defense of, those policies when the law is unsettled does not establish a willful violation of the ADEA. The district court correctly stated that this court's decision in *Westinghouse I* was evidence at least that the pre–1982 severance pay policies violated the ADEA. However, the district court decision[26] in *Westinghouse I*, which granted summary judgment to Westinghouse,

---

**23.** The timing of the change in the MSA plan is discussed *infra* footnote 26.

**24.** We note that Westinghouse did not change its MSA plan to provide an option until September, 1985. Because *Borden's* invalidated a plan similar to Westinghouse's pre–1985 MSA plan, and *Altoona* concluded that pension eligibility was not a reasonable factor other than age, the fact that Westinghouse did not change the structure of the MSA plan until almost two years after *Borden's* and *Altoona* were decided may support a finding of willfulness with respect to the pre–1985 MSA plan.

**25.** It appears that the earliest letter of violation was issued in June, 1983, after Westinghouse had changed its LIB plan to the ES & P plan, providing an option to retirement-eligible employees. Whether Westinghouse questioned its policies after issuance of those letters is relevant to willfulness on the 1982 ES & P and pension plans only. The district court did not draw that distinction.

**26.** *See* 577 F.Supp. 1029 (D.N.J.1982).

was rendered on July 29, 1982, and this court's decision in that case was published on January 20, 1984. To the extent that the district court decision in *Westinghouse I* supported Westinghouse's position that its 1979 plans did not violate the ADEA, there was no mandate to change its plans.[27] Furthermore, by the time this court rendered its decision in that case, Westinghouse had already changed its plans to provide an option. Our decision in *Westinghouse I* does not support a finding of willfulness with respect to the 1979 plans. Nor does it support a finding of willfulness with respect to the option plans because like *Borden's* and *Altoona,* it did not invalidate an option plan.

■ The district court also cited its rejection of the company's no-double-dipping rationale as support for its conclusion that Westinghouse willfully violated the Act. *See* 632 F.Supp. at 373. The court found that purported justification not credible and labelled it a belated attempt to avoid the ADEA, because it was inconsistent with Westinghouse's pension and severance pay plans. In light of those inconsistencies, *see supra* Part I, we cannot say that the district court's conclusion on this point was clearly erroneous.

■ The district court rejected Westinghouse's good-faith argument that the 1979 plans were designed before enactment of the ADEA, and that the 1982 plans were designed in reliance upon statements made by EEOC counsel in the New Jersey "Westinghouse" litigation. The court stated that this argument is "[p]erhaps the most telling evidence of the Company's willfulness...." 632 F.Supp. at 373. We recognize that continued maintenance of a plan that was lawful when developed could become the basis for a finding of willfulness if there were subsequent judicial or legislative invalidations of similar plans. Absent such forewarning, however, maintenance of a plan after enactment of a policy-oriented statute such as the ADEA, which broadly governs a plan but does not address the legality of the particular type

plan at issue, alone does not support a finding of willfulness. Similarly, the fact that Westinghouse changed its plans in July, 1982 (even after the district court decision in *Westinghouse I* supporting the company's position) in response to statements by EEOC counsel that an option plan would likely cure ADEA violations, by itself does not mandate a finding of willfulness. Therefore, on remand the district court should consider whether these factors support a finding of willfulness in conjunction with other factors it relied on that remain undisturbed by our resolution of this appeal.

■ The district court also found that when Westinghouse adopted an option plan in July, 1982, it acted not from a desire to comply with the ADEA, but merely "to prolong and ameliorate the predictable unfavorable outcome in litigation over the plans." 632 F.Supp. at 372. Changing a policy in response to litigation, however, does not necessarily support a finding that Westinghouse willfully violated the ADEA. The district court's conclusion may be appropriate, but our review of those portions of the record relied on by the district court does not establish willfulness. On remand, the district court should review the record to determine whether its conclusion was based solely on the fact that Westinghouse changed its plans in response to litigation, or whether it was also based on additional facts and credibility determinations concerning the company's intent.

*Conclusion*

Because we have concluded that some of the factors relied on by the district court in support of its finding of willfulness do not support such a finding, and because that court did not consider separately the 1979 plans and the 1982 plans when making its willfulness determination, we will vacate the judgment on the issue of willfulness. We will remand to the district court to reevaluate, in a manner consistent with this opinion, whether Westinghouse willfully vi-

---

27. Westinghouse's stated reason for changing to an option even though the district court's deci-

sion in *Westinghouse I* supported its position is discussed *infra.*

olated the ADEA. In all other respects, we will affirm the judgment of the district court.

Costs taxed against appellant.

GARTH, Circuit Judge, dissenting in part:

My colleagues in the majority have remanded this case to the district court to reevaluate "whether Westinghouse willfully violated ADEA." (Maj.op. at 714.) They have done so even though, after an exhaustive analysis of the district court's seven day trial record and the district court's 30–page opinion, the majority and I have concluded:

1) the district court's findings are clearly erroneous;

2) no evidence supports the district court's findings;

3) no suggestion appears that the parties were discouraged from adducing additional evidence or lulled into not producing additional evidence;

4) the district court fully complied with Fed.R.Civ.P. 52(a);

5) the district court in every respect applied the correct legal standard; and

6) the record is voluminous and comprehensive: (so much so, that the majority seeks only to have the district court review the very same record from which its original findings were made and as to which no evidence sufficient to sustain those findings appears).

Thus, although I agree with the majority that Westinghouse violated the ADEA and I agree that on this record, and this evidence, that the violation was not willful, I cannot agree that a remand should be ordered. In a case such as this one, where an extensive trial was held, where full opportunity was afforded for evidence to be presented by both parties, where correct legal standards were employed and where requisite findings (albeit clearly erroneous) were made, our disposition must be an outright reversal on the issue of willfulness.

The majority does not explain why, in such a situation a remand should be ordered and, "two bites of the apple" given to a litigant who has failed to produce sufficient evidence to support a desired finding and therefore carry its requisite burden as to a particular issue—in this case the issue of willfulness. By remanding, the majority grants EEOC a second chance to prove that Westinghouse has willfully violated the ADEA, when EEOC was unable to do so the first time around.

Typically, when a plaintiff brings an action and a court lawfully determines that the evidence is insufficient to sustain the plaintiff's claim, the plaintiff is barred by the principles of res judicata and/or collateral estoppel from seeking a more favorable result by entering another forum to adduce the same evidence in support of the same claim. While I do not claim that the doctrines of res judicata and collateral estoppel are applicable here, the principles of finality enshrined in those doctrines, speak to this very situation and provide the logic for our outright reversal of the district court's holding that Westinghouse violated the ADEA willfully. The majority by remanding this case to the district court, effectively negates the principles of res judicata and collateral estoppel. It does so by allowing EEOC to retry the very same claim that the majority now rejects due to an insufficiency of evidence.

I fail to understand why EEOC should be afforded still another opportunity to reargue before the district court the very same issue which it would be barred from bringing in any other forum. The only appropriate disposition of this appeal is *not to remand* for such a meaningless exercise by the district court, but *to reverse* on the issue of willfulness, even while we affirm the district court's findings on the non-willful Westinghouse violations.

I.

As I understand the jurisprudence which has developed with respect to when a remand to the district court is appropriate, the established precedents provide:

1) District courts are the fact-finders, appellate courts are not. *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). Thus, if a district

court fails to make requisite findings as prescribed by Fed.R.Civ.P. 52(a), such a proceeding should be remanded for the district court to discharge that function. *Shlensky v. Dorsey*, 574 F.2d 131 (3d Cir. 1978).

2) If the district court in making its findings applied, or relied on, an incorrect legal standard, it is appropriate to remand to the district court to rectify it error by fact-finding under the correct legal standard. *U.S. v. Gypsum*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Black United Fund of N.J., Inc. v. Kean*, 763 F.2d 156 (3d Cir. 1985).

3) If the district court has prevented a party from introducing admissible evidence, or has lulled a party into a false sense of security to the extent that otherwise admissible evidence was not adduced and findings based on such a truncated record were then made by the district court, a remand to frame proper findings on a proper record is appropriate. *Dunn v. United States*, 842 F.2d 1420 (3d Cir.1988).

4) Finally, remand may be discretionary in other rare circumstances, none of which have any relevance to the present case or to the present record. *Hritz v. Woma*, 732 F.2d 1178 (3d Cir.1984).

If, however, none of the above conditions obtain, and a district court on a complete, unchallenged, comprehensive record, has made findings which have no support in the evidence, a remand is not the correct disposition. This is particularly so, where no claim has ever been made that a party had additional evidence which it was not permitted to introduce. In such a circumstance, I know of no authority or reason for a reviewing court to remand so that a district court may seek to justify its initial findings on the same record already found deficient to support those findings.

## II.

Because I agree with the majority that the district court's findings which establish that Westinghouse violated the ADEA must be affirmed, there is no occasion for me to address that issue. However as I have indicated, the issue of "willfulness"

and the manner by which we dispose of that issue, causes me to part company with the majority.

To understand why I believe there can be no logic or basis for a remand one need only examine the reasons given by the majority in light of its analysis of the district court opinion. I turn to that task.

### A.

The majority opinion analyzes the four factors relied on by the district court for the district court's finding of willfulness and concludes that of the four factors, which led the district court to find willfulness on the part of Westinghouse, only one factor may be sustained. In this analysis I join the majority in its holding that the district court's findings and conclusions are flawed. Indeed, I go one step further than my colleagues in the majority, because although they hold that Westinghouse's policy against "double-dipping" may on this record be deemed to support the district court's finding of willfulness, (Maj.op. at 714) I do not. This difference between us is not significant, however, because the "double-dipping" policy alone, as the majority and I agree, is insufficient to sustain a finding of willfulness.

Three of the factors on which the district court relied to find willfulness—factors which were rejected by the majority because the findings made by the district court were clearly erroneous—were:

1) Westinghouse had ignored judicial invalidations of plans similar to its own.

2) Westinghouse had failed to change its policies after receiving notification from EEOC and after commencement of litigation challenging its plan.

3) Westinghouse was not in good-faith in contending that its 1979 plan (designed before ADEA was enacted), comported with the law at that time, and that Westinghouse was not in "good faith" when it designed its 1982 plan relying on statements made by EEOC to the effect that an option plan (the center piece of the 1982 plan), would cure any defects.

We have rejected the district court's findings and conclusions with respect to each of these factors.

(i)

As to the first factor relied on by the district court, where the district court found that Westinghouse had ignored judicial authorities which had invalidated plans that were similar to its own, we have held the district court erred in so ruling.

The majority opinion correctly reasons that when Westinghouse's plans are considered separately in relation to the judicial precedents which had invalidated so-called similar plans, it cannot be argued that Westinghouse ignored authoritative precedents. The majority opinion analyzed Westinghouse's severance pay plan and Westinghouse's option plan in light of *Equal Employment Opportunity Comm'n v. Borden's Inc.*, 724 F.2d 1390 (9th Cir.1984) and *Equal Employment Opportunity Comm'n v. City of Altoona*, 723 F.2d 4 (3d Cir.1983), *cert. denied* 467 U.S. 1204, 104 S.Ct. 2386, 81 L.Ed.2d 344 (1984) (Maj.op., *supra*, 713) and concludes that "[b]ecause *Borden's* was not decided until *after* Westinghouse changed its LIB plan, [*Borden's* ] does not support a finding of willfulness with respect to Westinghouse's 1979 LIB plan." (emphasis added) *Id.* at 713. It goes on to hold that "... because *Borden's* did not confront an option plan like Westinghouse adopted in July 1982, it does not support a finding that Westinghouse willfully violated the ADEA by maintaining its ES & P, an option type MSA plan." *id.* at 713. It further holds that "... *Altoona* does not support a finding that Westinghouse willfully violated the ADEA with respect to either the 1979 plans or the 1982 plans," *id.*, because "... by the time *Altoona* was decided, Westinghouse had already changed its LIB plan to provide an option (ES & P), and no longer flatly denied severance pay to pension eligibles." *Id.* Moreover, the majority opinion correctly recognizes that "... we did not hold in *Altoona* that an option plan violated the ADEA...." *Id.* The majority opinion therefore concludes that Westinghouse did not ignore "the handwriting on the wall" and that *Borden's* and *Altoona* do not support a finding of willfulness concerning any of the Westinghouse plans. *Id.* at 714.

Having so held, and having so dispositively rejected the district court's findings and analysis, I suggest that a remand to the district court to "consider separately the 1979 plans and the 1982 plans" as the majority opinion directs (Maj.op. at 714) would serve utterly no purpose. The district court has exhaustively analyzed the evidence and the law in this respect and, as the majority opinion now reveals, that analysis was flawed. We, on the other hand, have thoroughly assessed the impact of these decisions on Westinghouse's plans, and we have now determined Westinghouse cannot be faulted, at least to the extent of finding willfulness with respect to the plans which it adopted. This is particularly so, since the resolution of the issue of "willfulness," in light of the then prevailing precedents must necessarily entail a legal determination which we are as well equipped to render as the district court. Indeed, we have rendered that decision today.

(ii)

The second factor relied on by the district court, concerning Westinghouse's failure to change its policies, has also been rejected by us. As the majority opinion reasons, Westinghouse's "good-faith adherence to, and defense of" its policies, when the law is unsettled cannot establish a willful violation of the ADEA. (Maj.op. at 713). As a result, Westinghouse's actions concerning either of its plans may not be construed as willful.

(iii)

Finally, we have rejected the district court's finding that Westinghouse was not in "good-faith" when it designed its 1979 plan (before ADEA was enacted), and when it redesigned its 1982 plan in reliance on the statements by EEOC counsel in the New Jersey Westinghouse litigation. We disapproved the district court's finding by

holding that there was no clear "forewarning" that Westinghouse's plans were illegal, or that the change to an option plan, based on EEOC counsel's statements, can sustain a finding of willfulness. (Maj.op. at 714.)

(iv)

Therefore, the only factor identified by the district court which could bear on "willfulness", and which was not held to be clearly erroneous by the majority, was the district court's determination that Westinghouse had invented a policy against "double-dipping" in order to justify its unwillingness to comply with the ADEA. Even if that determination was not in error, the majority opinion has appropriately concluded that such a policy against "double-dipping," of and by itself, cannot sustain a finding of willfulness. Thus, this court on its own independent review of the record, properly holds that the findings made by the district court are not supported by evidence in the record and that accordingly, willfulness has not been established.

B.

At this point, therefore, under the majority's analysis of the record, an analysis with which I concur, the district court was clearly erroneous in finding that Westinghouse willfully violated the ADEA. This being so, all that remains is for us to implement our decision by an appropriate disposition of this appeal. However, the majority of the court has concluded its opinion by directing a remand, stating:

> Because we have concluded that some of the factors relied on by the district court in support of its findings of willfulness do not support such a finding, and because that court did not consider separately the 1979 plans and the 1982 plans when making its willfulness determination, we will remand to the district court to reevaluate, in a manner consistent with this opinion, whether Westinghouse willfully violated the ADEA. In all other respects, we will affirm the judgment of the district court.

Maj.op. at 714.

Both the majority opinion and this dissent have demonstrated on this record that three of the four factors relied on by the district court to establish "willfulness" are not supported by evidence of record and the fourth factor (a policy against double-dipping), without more, cannot by itself, support such a finding. Thus, no reason exists to remand for district court reconsideration. No purpose can be served by a remand to the district court to reconsider its findings when we have already determined that those findings on this record cannot support a willful violation.

Not only is there no basis in law to remand to the district court (as distinct from an outright reversal), but of equal importance, equitable considerations militate against any further delay in the implementation of the district court's judgment which concludes that Westinghouse had committed a violation of the ADEA.

As EEOC has emphasized in all litigation brought under the ADEA—time is of the essence. EEOC has called our attention to the fact that some of the former employees aggrieved by Westinghouse's violations of the ADEA have already died and, thus, will be unable to receive the direct benefit flowing from the district court's judgment. Moreover, this case from which the present appeal arises was based on charges filed as long ago as November 10, 1983. The appeal from the district court judgment was itself argued well over a year ago. If we remand to the district court, rather than reverse with a direction to the district court to correct its judgment, this court's decision will mark the beginning of still another stage of litigation and that litigation will undoubtedly continue through months and years to come.

Thus, the most compelling considerations of equity, fairness and law dictate that the only just disposition of this appeal, is to affirm the district court's finding that Westinghouse violated the ADEA and, at the same time, reverse the district court's finding of willfulness, with a direction that the district court modify its judgment accordingly.

Anyone who has studied the district court record and the district court's very

comprehensive opinion which has combed, analyzed and sifted every bit of evidence, can only conclude that if there was any evidence which could support a finding of willfulness, the district court would have unquestionably identified that evidence, referred to it in its opinion and thus called it to our attention. To suggest that the district court ignored evidence and factors which would have supported its findings, is to indulge in unwarranted speculation and is to denigrate the thoroughness with which the district court approached its task.

For the foregoing reasons, I disagree strongly with the majority's decision to remand to the district court, as I know of no purpose which can be served by such an action. I, therefore, respectfully dissent from so much of the majority's disposition as would remand to the district court for a redetermination of the issue of willfulness.